NATIONAL FEDERATION OF
FEDERAL EMPLOYEES,
et al.

v.

Paul GREENBERG, Major General, Commander, Headquarters, Army, Armament, Munitions & Chemical Command, et al., Appellants.

No. 92–5216.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1992.

Decided Jan. 29, 1993.

Freddi Lipstein, Dept. of Justice, Washington, DC, argued the cause for the appellants. With her on the briefs were Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Edith Marshall, Asst. U.S. Atty., Barbara L. Herwig, Leonard Schaitman and Margaret S. Hewing, Attorneys, Dept. of Justice, and Sally M. Rider, Asst. U.S. Atty., Washington, DC.

Joshua F. Bowers, National Federation of Federal Employees, Washington, DC, argued the cause for appellees. With him on the brief was H. Stephan Gordon, Gen. Counsel, Nat. Federation of Federal Employees, Washington, DC.

Kate Martin, Washington, DC, argued the cause for amici curiae American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of the Nat. Capital Area. With her on the brief were Arthur B. Spitzer, D. Michael Fitzhugh and Jonathan L. Diesenhaus, Washington, DC.

Before: EDWARDS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge SENTELLE.

RANDOLPH, Circuit Judge:

In the wake of several highly publicized spy scandals, the Department of Defense began reinvestigating its civilian employees holding security clearances at the "secret" level. The Department requested these employees, on a voluntary basis, "[t]o [p]rovide background information for personnel security investigative and evaluative pur-poses" by completing the "National Agency Questionnaire," formally designated DD Form 398–2. The Questionnaire informed each employee that "failure to furnish the requested information may ·result in our being unable to complete your investigation, which could result in your not being considered for clearance, access, entry into a uniformed service, or assignment to sensitive duties."

Four civilian Defense Department employees, a national union representing federal workers and three of its local unions brought suit challenging four of DD Form 398–2's questions—Questions 18, 19, 20 and 21. The parties have reached a settlement on Question 21, which had been designed to elicit information about employees' organizational affiliations. The remaining questions are as follows.

Question 18 requests employees to reveal their criminal arrest history, without regard to whether charges were dropped or dismissed, resulted in an acquittal, or whether the employee was a juvenile at the time of arrest.

Question 19 asks employees about their credit history, and seeks detailed explanations of any petitions for bankruptcy, garnishment of wages, tax liens, outstanding judgments or delinquent debts.

Question 20 solicits a complete mental health and drug and alcohol use history. Employees are asked to disclose their use of any controlled substances; their involvement with the illegal manufacture, production, purchase or sale of such drugs; their abuse of prescription drugs, or use of alcohol resulting in loss of their job or their discipline, arrest, or treatment; and any treatment they received for a mental, emotional or psychological condition, and any counselling of them by a mental health professional.

Employees are instructed: "Answers to questions in items 18 through 22 are <u>NOT</u> limited to the last 5, 10, or 15 years, but pertain to your entire life." The Questionnaire also requests each employee to sign a release authorizing the Department to obtain complete background records relating

to any of the activities disclosed on the form.

The district court granted plaintiffs' motion for a preliminary injunction forbidding the Defense Department from "compelling answers" to Questions 18, 19 or 20, and from using information provided in response to these questions. *National Fed'n of Fed. Employees v. Greenberg*, 789 F.Supp. 430, 440 (D.D.C.1992).

## I

Differences between what plaintiffs argue on appeal and what they alleged in the district court; the grounds on which the district court placed its decision; and a concession in plaintiffs' appellate brief require a more extensive explanation than usual of what legal issues may properly be considered in this appeal.

In their original and amended complaints plaintiffs attacked the drug use portion of Question 20 on the ground that it violated the Fifth Amendment privilege against self-incrimination. The district court decided in plaintiffs' favor and the Fifth Amendment issues raised by this ruling are thus before us. We put them to one side for the moment.

■ Question 19 (finances) is another matter. The original complaint alleged only that this question violated the Privacy Act, 5 U.S.C. § 552a. As we read the district court's opinion, the ruling in plaintiffs' favor rested solely on the Privacy Act. *See* 789 F.Supp. at 433–34. Plaintiffs' amended complaint and their second amended complaint, both filed after the preliminary injunction issued, also alleged only a Privacy Act violation. In this court, plaintiffs "withdraw the Privacy Act challenge to the [Questionnaire]." Brief for Appellees at 2 n. 1. One might wonder what is left? Plaintiffs spend several pages in their brief explaining why the government has no compelling need for the financial information sought by Question 19. This is included as part of their overall argument—the only argument they now press other than their Fifth Amendment contention—that each of the questions deprives them of a constitutional right to privacy. Yet as a matter of prudence if not jurisdiction, claims neither raised nor addressed below usually may not be heard on appeal. *See Yee v. City of Escondido*, — U.S. —, — – —, 112 S.Ct. 1522, 1531–34, 118 L.Ed.2d 153 (1992). We include the hedge "usually" because the ban may be overcome. *See EEOC v. FLRA*, 476 U.S. 19, 23–24, 106 S.Ct. 1678, 1681, 90 L.Ed.2d 19 (1986) (per curiam); *Roosevelt v. E.I. DuPont de Nemours & Co.*, 958 F.2d 416, 419 n. 5 (D.C.Cir.1992). One reason for doing so here is that both parties have fully briefed and argued the constitutionality of Question 19. *Contrast Rollins Environmental Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n. 2 (D.C.Cir.1991). Another is that the government failed to object to plaintiffs' new claim. One might say that although plaintiffs had waived their right to mount a constitutional argument against Question 19, the government thereby waived its right to complain. *Carlson v. Green*, 446 U.S. 14, 17 n. 2, 100 S.Ct. 1468, 1470 n. 2, 64 L.Ed.2d 15 (1980), suggests this approach. *Cf. Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 697, 104 S.Ct. 2694, 2699, 81 L.Ed.2d 580 (1984). Parties too often frame appellate cases through their combined neglect. Still, we will take this case as it has been briefed. The legal issues regarding the constitutionality of Question 19 are fundamentally the same as the issues regarding the rest of the Questionnaire. If we refused to consider them, it would still be open to plaintiffs to amend their complaint once again. The issue might then return to us in the same form if the district court allowed the amendment and issued an order granting or denying a preliminary or permanent injunction against Question 19's use.

■ With respect to Question 18 (arrests), plaintiffs' original and amended complaints also raised only a Privacy Act claim, which is all the district court decided. *See* 789 F.Supp. at 433–34. The second amended complaint added a constitutional right of privacy claim and this, as we have indicated, is the only issue regarding Question 18 plaintiffs argue on appeal. Although the second amended complaint was

filed only after the court issued its opinion, we will treat the constitutional claim as one raised in the court below. The case is here on appeal from a preliminary injunction. In theory, at least, proceedings leading to a decision on a permanent injunction are ongoing. Plaintiffs therefore have the advantage of the familiar rule that on appeal, the prevailing party may support a judgment in its favor on any grounds urged *or* decided below. *See, e.g., United States v. Williams,* — U.S. ——, —— – ——, 112 S.Ct. 1735, 1738–41, 118 L.Ed.2d 352 (1992); *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970); *United States v. Williams,* 951 F.2d 1287, 1290 (D.C.Cir.1991).

The same rule entitles plaintiffs to argue the constitutionality of the mental health portion of Question 20. While their original and their amended complaints contested this question only on Privacy Act grounds, which they have now relinquished, the district court enjoined the Department from asking for mental health information partly on the ground that this would invade plaintiffs' constitutionally protected privacy. *See* 789 F.Supp. at 434–35.[1]

## II

■ We therefore have before us the constitutionality of each of the three questions described above. However, on the authority of *Department of Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), the government maintains that the district court should not have passed on them and neither should we. *Egan* held that the charter of the Merit Systems Protection Board did not empower the Board to consider the validity of the Navy's denial of a security clearance to one of its employees. Describing the granting of a security

clearance as "a sensitive and inherently discretionary judgment call" ultimately resting on a prediction about future behavior, the Court determined that the Board, as an "outside, nonexpert body," was not in a position to second-guess the Navy's judgment or to determine "what constitutes an acceptable margin of error in assessing the potential risk." 484 U.S. at 527, 528, 529, 108 S.Ct. at 823, 824, 825. The government takes *Egan* two steps further: since the Board may not review the merits of security-clearance denials, federal courts may not consider constitutional challenges to such denials; and since the government's security-clearance judgments are thus judicially unreviewable, so are the government's judgments about what information employees must disclose during security clearance investigations.

A case decided shortly after *Egan* undercuts the government's first proposition. It is simply not the case that all security-clearance decisions are immune from judicial review. In *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), an action brought under the Administrative Procedure Act, the Court ordered the district court to adjudicate a terminated employee's colorable constitutional challenge to the CIA's denial of his security clearance. 486 U.S. at 601–05, 108 S.Ct. at 2052–54. The government dismisses *Webster v. Doe* on the basis that the CIA Director there was exercising statutory power in firing the employee for security reasons, *see* § 102(c) of the National Security Act, 50 U.S.C. § 403(c), whereas the Defense Department's use of the Questionnaire rests on a delegation of the President's constitutional power as Commander–in–Chief under article II, section 2. *See Dorfmont v. Brown,* 913 F.2d 1399, 1404–

---

1. Plaintiffs also press on appeal a constitutional privacy challenge to the drug use portion of Question 20. Although this claim was not raised below until the filing of plaintiffs' second amended complaint, and was not decided by the district court, we will treat it as properly before us for the reasons just stated in the text.

  The remainder of Question 20 asks for information regarding the employee's abuse of alcohol leading to the loss of a job, disciplinary action, arrest or treatment for alcoholism. In

the district court plaintiffs raised no constitutional claim regarding this part of Question 20; their allegations rested entirely on the Privacy Act. The district court's discussion of this subject consists merely of a footnote describing the alcohol question. 789 F.Supp. at 434 n. 8. Nevertheless, for the reasons given in regard to Question 19, we will treat the constitutional challenge to this portion of Question 20 as if it were properly before us.

05 (9th Cir.1990) (Kozinski, J., concurring), *cert. denied,* —— U.S. ——, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991): The Court in *Webster v. Doe* did not mention any such distinction and its significance is far from evident. The power conferred on the President by the Constitution, we may assume, is more extensive than § 102(c)'s generous grant of authority to the CIA Director to terminate employees in the "interests of the United States." Even if this mattered in cases challenging, on constitutional grounds, discretionary judgments regarding a particular employee's security clearance, such cases are not our concern here. The substantive issues before us relate to the constitutionality of the methods used to gather information on which such judgments presumably will be based. To stretch *Egan* to cover this case would be to endorse untenable, and far-reaching, restrictions on judicial review of governmental actions.

All questions of government are ultimately questions of ends and means. The end may be legitimate, its accomplishment may be entrusted solely to the President, yet the judiciary still may properly scrutinize the manner in which the objective is to be achieved. Suppose the President has unlimited and judicially unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets. No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review. The government may have considerable leeway to determine what information it needs from employees holding security clearances and how to go about getting it. But a large measure of discretion gives rise to judicial deference, not immunity from judicial review of constitutional claims. *Harmon v. Thornburgh,* 878 F.2d 484, 491–92 (D.C.Cir. 1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), illustrates the point: we there considered but upheld, against a Fourth Amendment challenge, random drug testing of Justice Department employees holding top secret security clearances. *United States Info. Agency v. Krc,* 905 F.2d 389, 398–99 (D.C.Cir.1990), is similar; we reviewed but rejected Krc's claim that the United States Information Agency deprived him of due process by firing him for security reasons without following proper procedures. *See also Dorfmont v. Brown,* 913 F.2d at 1402–04; *Jamil v. Secretary, Dep't of Defense,* 910 F.2d 1203, 1209 (4th Cir.1990); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 570–81 (9th Cir.1990); *Hill v. Department of Air Force,* 844 F.2d 1407, 1411–12 (10th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 49 (1988); *cf. Doe v. Cheney,* 885 F.2d 898, 909–10 (D.C.Cir.1989). In none of the cases just cited did the courts refuse to render a decision on the ground that the government's actions were exempt from judicial review.

The government further confuses the merits with judicial authority to pass upon them when it argues that most of plaintiffs' contentions are not subject to review because they rest on "generalized privacy claims." Reply Brief for Appellants at 6. That plaintiffs lack any specific constitutional foundation for their claims may be a sufficient reason for rejecting them on the merits. But it is not a reason for refusing to consider them altogether. To hold otherwise would be to approve a system in which courts pass on the legal sufficiency of constitutional arguments in order to determine whether they may pass on their validity, a system in which courts would adjudicate in the guise of not adjudicating. Apart from a wholly frivolous constitutional claim or an immaterial one advanced solely for the purpose of obtaining jurisdiction, the court must decide the merits of the claim (*see Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)), unless other considerations unrelated to the merits show the claim to be unsuitable for adjudication.

We therefore proceed to consider the two constitutional theories urged in support of the preliminary injunction.

## III

The narrower of plaintiffs' claims is based on the Fifth Amendment privilege against self-incrimination and is directed at the portion of Question 20 asking employees to disclose illegal drug use or dealing. The district court ruled that plaintiffs had a substantial probability of succeeding on their Fifth Amendment challenge, a prerequisite to the granting of a preliminary injunction. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). The court's opinion on this question of law, an opinion to which we owe no deference (*City of Las Vegas v. Lujan*, 891 F.2d 927, 931–32 (D.C.Cir.1989)), rested on the possibly incriminating nature of responses to Question 20 and the Questionnaire's general warning that information employees provided may be turned over to "federal, state, local, or foreign law enforcement authorities if the record indicates, on its face or in conjunction with other records, a violation of law. . . ."

■ Why this should have led the court to enjoin the Defense Department from propounding Question 20 is uncertain. There are four individual plaintiffs, each of whom is a longtime civilian employee at an Army facility, but the record contains the declarations of only two of these individuals. Neither reports having invoked his Fifth Amendment privilege in response to Question 20. The other plaintiffs are the National Federation of Federal Employees, a union representing nearly 150,000 federal employees, some of whom presumably work for the Defense Department and hold security clearances, and three of the union's local chapters. There is no indication in the record that any union member refused to answer Question 20 on the basis of the Fifth Amendment privilege. The Chief of the Adjudications Division of the Army's Central Personnel Security Clearance Facility reported in an affidavit that she is unaware of any employee who has asserted the privilege in response to the National Agency Questionnaire.

■ Ordinarily, a person must invoke the privilege in order to gain its advantage.

*Minnesota v. Murphy*, 465 U.S. 420, 427–29, 104 S.Ct. 1136, 1142–43, 79 L.Ed.2d 409 (1984); *United States v. Kordel*, 397 U.S. 1, 7–10, 90 S.Ct. 763, 766–68, 25 L.Ed.2d 1 (1970). *See also United States v. Haldeman*, 559 F.2d 31, 94–96 (D.C.Cir.1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). If a witness called to testify "makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Minnesota v. Murphy*, 465 U.S. at 427, 104 S.Ct. at 1142 (*quoting Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976)); *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 858, 104 S.Ct. 3348, 3358, 82 L.Ed.2d 632 (1984). The reason is apparent: the Fifth Amendment does not forbid the government from asking questions and it does not forbid the government from taking the answers. What is forbidden is *compelling* an individual to testify against himself. Even so, "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying." *Gardner v. Broderick*, 392 U.S. 273, 276, 88 S.Ct. 1913, 1915, 20 L.Ed.2d 1082 (1968).

■ Like other individuals, government employees enjoy the protection of the privilege against self-incrimination. Yet the government, like private employers, needs to ensure that its employees are faithfully performing their duties. The government therefore may fire employees who refuse, on the basis of their Fifth Amendment privilege, to answer questions concerning the performance of their duties, so long as the employees' answers could not be used against them in a criminal prosecution. *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Gardner v. Broderick*, 392 U.S. at 278–79, 88 S.Ct. at 1916; *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280, 284–85, 88 S.Ct. 1917, 1919–20, 20 L.Ed.2d 1089 (1968). For purposes of the Fifth Amendment, the threat of firing or other economic sanctions

may constitute compulsion. But the protection of the privilege extends only to criminal prosecutions. A government employee would not be incriminating himself within the meaning of the Fifth Amendment if his answers could not be used against him in a criminal case. *See generally Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 426 F.2d 619 (2d Cir.1970) (Friendly, J.), *cert. denied*, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).

Plaintiffs' challenge to Question 20 thus encounters a severe obstacle. Admitting the use of illegal drugs, at least use so recent that the statutes of limitation have not run, would doubtless be incriminating. But are answers to Question 20 compelled? That depends on the consequence of refusing to answer. In *Gardner*, the police officer invoked the privilege, refused to waive use immunity and, as a result, lost his job. The contractor in *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), followed the same course and, by statute, thereby became ineligible for public contracting work. *See also Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). Here no one has declined to answer Question 20. Compulsion therefore turns on what the government would do in such a case, rather than on what in fact it has done. One thing more. The constitutional attack on Question 20 is facial. The burden plaintiffs must shoulder is heavy. They must show that Question 20 in *all*, rather than just some, of its possible applications violates the Fifth Amendment privilege. *See Rust v. Sullivan*, —— U.S. ——, ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

As to the consequences of an employee's invoking of the privilege in response to Question 20, the Questionnaire indicates only that an employee's failure to answer any question "may result" in the Department being unable to complete the security reclearance investigation, which "could re-

sult" in a denial of reclearance. The extensive regulations governing the Defense Department's security clearance operation reveal nothing further about how the Department would respond to a claim of Fifth Amendment privilege. *See* 32 C.F.R. pt. 154. The Executive Order requiring agencies to establish personnel security programs is silent on the subject. *See* Exec. Order No. 10,450, 3 C.F.R. 936 (1949–1953 Comp.). According to an affidavit submitted by the government, civilian Army employees invoking the Fifth Amendment privilege would be evaluated on a case-by-case basis.

The most that can be said, therefore, is that some employees invoking the Fifth Amendment might wind up losing their security clearances while others might not. An employee's failure to answer Question 20 may detract from the thoroughness of the security clearance investigation, but this is only one among many factors. "[T]his case is very different from the circumstances before the Court in the *Garrity–Lefkowitz* decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). In light of the record before us, it cannot be said that employees confronted with Question 20 are invariably compelled to provide an answer. This in itself is sufficient to defeat the facial attack plaintiffs mount against the question. In at least some of its applications, Question 20 does not violate the Fifth Amendment privilege.

Other considerations point in the same direction. Take, for example, an employee who wishes only to avoid disclosing drug use in the distant past. If the state and federal statutes of limitation would bar prosecution, the employee's answer would not be incriminatory and the privilege could not be successfully invoked. *See, e.g., In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 872 (7th Cir.1979). Question 20, in such instances, obviously would not

run afoul of the Fifth Amendment. Nor would Question 20 implicate the Fifth Amendment when the risk of self-incrimination is not "real and appreciable" but is instead "so improbable that no reasonable man would suffer it to influence his conduct." *Brown v. Walker*, 161 U.S. 591, 599–600, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896) (citation omitted). *See, e.g., Devine v. Goodstein*, 680 F.2d 243, 247 (D.C.Cir. 1982) (per curiam). Question 20, in other words, could not possibly be considered unconstitutional as applied to employees who do not reasonably believe their answers would subject them to criminal liability. Question 20 would also survive a Fifth Amendment challenge if the Defense Department responded to an employee's assertion of the privilege by offering use immunity and directing the employee to answer upon pain of losing his security clearance. That the Defense Department does not have regulations spelling out this possible response is not determinative. When incriminating answers are compelled, the Fifth Amendment, of its own force, prevents their use against the individual in criminal proceedings. As Judge Friendly said in *Uniformed Sanitation Men*, 426 F.2d at 626, on remand from the Supreme Court, "[i]f 'use immunity' thus suffices to permit the discharge of a public employee who refuses to answer questions about his conduct on the ground of self-incrimination, we see no reason why there must be a statute conferring it."

We therefore conclude that the district court erred in thinking that plaintiffs had shown a probability of succeeding in their facial attack on the drug use portion of Question 20. For the reasons mentioned it appears highly unlikely that plaintiffs could prevail on their Fifth Amendment theory.

IV

Plaintiffs' remaining argument is that Questions 18, 19 and 20 of the National Agency Questionnaire violate a constitutional right to privacy. The Supreme Court

has described *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), as decisions protecting the "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). *See also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 455–58, 97 S.Ct. 2777, 2796–98, 53 L.Ed.2d 867 (1977). In *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1019 (D.C.Cir.1984), a panel of this court took *Whalen* and *Nixon* to mean that "a litigant's interest in avoiding public disclosure of private information is grounded in the Constitution itself...." Whether the panel's focus on "public disclosure" would advance plaintiffs' argument about disclosure only to government investigators is not worth pondering. The court, sitting *en banc*, vacated the panel's decision in *Tavoulareas*, and it therefore has no precedential value. *See* 737 F.2d 1170 (D.C.Cir. 1984). When we return to *Whalen* and look behind the Supreme Court's general remark, quoted above, we find ambiguity. What "individual interests" receive protection from disclosure? Plaintiffs suggest the interest in avoiding humiliation or embarrassment entailed in the disclosure of personal information. What "personal information" and disclosure to whom? To the government as employer or to the world? However one defines the scope of the protection, what are the provisions in the Constitution that are said to confer it? *Cf. Dronenburg v. Zech*, 741 F.2d 1388 (D.C.Cir.1984). We cannot tell from plaintiffs' brief. It refers to nothing more specific than "[t]he Constitution" as the foundation for this constitutional right. And what of the government's interests in carrying out its constitutional responsibilities?

Much to our relief, this case does not require any extended survey of this uncharted terrain. Plaintiffs' second amended complaint presented only a facial challenge to the National Agency Questionnaire.[2] As mentioned in the previous sec-

**2.** The introduction to plaintiffs' second amended complaint states: "The NAQ includes ques-

tions which go beyond the scope of inquiry allowed by the Constitution of the United States

tion and as *American Library Association v. Barr*, 956 F.2d 1178, 1188–89 (D.C.Cir. 1992), explains in greater detail, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). *See also Rust v. Sullivan*, — U.S. —, —, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988). If "some quite straightforward applications" of the law are constitutional, plaintiffs therefore lose. *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 524, 109 S.Ct. 3040, 3059, 106 L.Ed.2d 410 (1989) (O'Connor, J., concurring in part and in the judgment).

■ As the case has progressed thus far, plaintiffs appear to have little chance of prevailing on their privacy theory. For one thing, the record casts doubt on whether they are being forced to reveal the information, and therefore doubt about whether their privacy is being invaded. Even on plaintiffs' theory, questions do not invade privacy, answers do. But the Questionnaire itself informs employees that their compliance is "voluntary." The consequences of an employee's refusing to respond are unclear and, on this record, unknowable. Much will depend on the individual's circumstances and the particular question or questions that remain unanswered. Question 18, for example, calls for arrest records. Despite an employee's recalcitrance, the Defense Department might be able to obtain the same information from other sources. The same is true for some financial data sought in Question 19. On the face of it, the Questionnaire suggests that if the investigation can be completed, nothing detrimental will follow the employee's refusal to cooperate.

It is also plain to us that none of the three questions could possibly be considered unconstitutional on their face, even if employees were forced to respond as a condition of retaining their security clearances. Plaintiffs' complaint about Question 18, which seeks information about arrests, is that nonrelevant information may be elicited. Unaccountably, the government does not even cite *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), holding in the clearest possible terms that no constitutional right of privacy is violated by the disclosure "of an official act such as an arrest." *Paul* aside, it is clear that answers to Question 18, may reveal highly pertinent information. Consider, for example, a person holding a security clearance who had been arrested but not yet tried. Or take a person with a history of recent arrests for driving while intoxicated who avoided conviction by attending a rehabilitation program. To paraphrase Jefferson, if a man cannot govern himself he cannot be trusted with the government of others. There are, in other words, possible valid applications of Question 18, applications not even plaintiffs contest. The same is true for Questions 19 and 20. Substantial debts, with the attendant financial pressure exerted on employees holding security clearances, or on-going mental health problems are, by anyone's light, important elements of the "[p]redictive judgment," *Egan*, 484 U.S. at 529, 108 S.Ct. at 825, involved in determining whether a person can be trusted to maintain the nation's secrets. Plaintiffs' quarrel with Questions 19 and 20, like their objection to Question 18, is that the questions sweep too broadly, that they ask for information from the distant past, information with no discernible bearing on present

and applicable regulations." The complaint's factual allegations are not directed to the particular circumstances of any individual plaintiff. The complaint uses impersonal terminology such as "an employee" or "employees" (*e.g.,* "Question 19 requires an employee . . .") rather than the term "plaintiffs." Count VI, which recites plaintiffs' constitutional privacy claim, consists entirely of general allegations; nothing is mentioned about any of the individual plaintiffs. The gravamen of the complaint is not "the manner in which [the statute] had been administered in practice." *Bowen v. Kendrick*, 487 U.S. 589, 601, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988).

performance. But in a facial challenge, the fact that there may arguably be some invalid applications is beside the point; what matters is whether there are any valid ones. Here the district court acknowledged the existence of legitimate applications, noting that "the Department may be entitled to *some* information with respect to *some* employees." *National Fed'n of Fed. Employees*, 789 F.Supp. at 434. The court's error was in not recognizing that its conclusion compelled rejection of plaintiffs' claim.

One further point deserves mention. Plaintiffs' brief contains several references to "overbreadth." In First Amendment cases, and in First Amendment cases only, the Supreme Court has struck down laws having some valid applications (even to the plaintiffs before the court) on their face because the laws, if allowed to stand, could "inhibit the constitutionally protected speech of third parties." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984). *See generally New York v. Ferber*, 458 U.S. 747, 766–73, 102 S.Ct. 3348, 3359–63, 73 L.Ed.2d 1113 (1982). The concern underlying the overbreadth doctrine—chilling protected speech—is absent here. *See Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100; *Schall v. Martin*, 467 U.S. 253, 268 n. 18, 104 S.Ct. 2403, 2412, n. 18, 81 L.Ed.2d 207 (1984). *See also Lutz v. City of York, Pa.*, 899 F.2d 255, 271 (3d Cir.1990). The Questionnaire asks about arrests, finances, mental health difficulties, and drug and alcohol use. These are not activities within the freedom of speech and, in any event, disclosing information about these subjects could not conceivably deter plaintiffs or their members from engaging in any protected speech. *See American Library Ass'n*, 956 F.2d at 1190.

\*     \*     \*     \*     \*     \*

Because neither of plaintiffs' theories support the preliminary injunction, we vacate the district court's order and remand for further proceedings.

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in the judgment of the court and in much of Judge Randolph's opinion. I write separately to stress several points and to explain where I differ with the majority.

First, in addressing the claims based on the Fifth Amendment privilege against self-incrimination, we do *not* reach the question whether the Government may lawfully fire an employee who refuses to answer a question relating to, say, drug or alcohol use. The majority cites *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), for the proposition that an employee may be fired if he refuses, "on the basis of [his] Fifth Amendment privilege," to answer questions "concerning the performance of [his] duties...." In this case, it is far from clear that inquiries about an employee's drug or alcohol use over the course of his "entire life" always will pertain to "the performance of his duties," especially if the alleged conduct was off-duty and the employee has a long history of exemplary service with the Government. We do not, and need not, address whether such information is job-related and, if not, whether an employee has constitutional or statutory protections against discharge for refusing to answer questions relating thereto.

Second, as the majority opinion makes clear, compliance with the questionnaire is "voluntary." Furthermore, at least on the record now before us, it is impossible to know whether or how the Government might seek to compel the release of information that an employee may be reluctant to give, because it is highly personal and unrelated in any meaningful way to security clearance. It is hardly insignificant that employees are advised that their compliance is "voluntary," and this surely will have some bearing on Government actions (and judicial assessments thereof) in the future.

Third, I find no "ambiguity" in the core principle undergirding the Supreme Court's decision in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), which describes the constitutional right to privacy as protecting the "individual interest in

avoiding disclosure of personal matters...." *Id.* at 599, 97 S.Ct. at 876 (footnote omitted). The majority is correct in concluding that this case does not warrant a "survey" of the law covering an individual's right to privacy, but this cannot be taken to mean that the right itself is in doubt. I therefore do not join in the questions posed by the majority following what I view as a dubious suggestion that the essential point underlying *Whalen* is ambiguous.

Fourth, I do not read *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), as the majority seemingly does, to say that the Government does not violate an employee's right to privacy if it "forces" the employee (on threat of job loss) to reveal personal information that arguably has no relevance to job performance. Rather, in *Paul*, the Supreme Court merely held that the right of privacy did not prohibit the State from *"publiciz[ing]* a [known] record of an official act such as an arrest." *Id.* at 713, 96 S.Ct. at 1166 (emphasis added). The Court did not say that the State could *compel disclosure* of personal matters—whether or not job-related—as a condition of continued employment.

In a similar vein, I do not accept the majority's example that "driving while intoxicated" is clearly related to a security clearance. The majority supports this example by citing the proposition that "if a man cannot govern himself he cannot be trusted with the government of others." The case law requires more than an epigram to justify revocation of a security clearance; it is common understanding, I think, that many people engage in questionable activity off of the job that in no way impairs their job performance. *See, e.g., Hoska v. United States Dep't of the Army,* 677 F.2d 131, 138 (D.C.Cir.1982) ("In most security clearance cases, courts have specifically insisted upon a rational nexus between the denial or withdrawal of an individual's security clearance and the individual's ability to protect classified information.") In any event, I do agree that the relevance of these matters must be left for another day.

Apart from the foregoing concerns, I concur.

SENTELLE, Circuit Judge, concurring:

I concur in the opinion of the Court, and write separately (and briefly) only to point out what I understand the Court *not* to be doing. I do not understand us to be doing any more than passing on the constitutionality of a particular method of information-gathering in the pursuit of national security interests by the Department of Defense. That is to say, I understand us to recognize that we are not positioned to displace the Executive as the decisionmaker in the area of defense.

Jurisdiction over an issue does not automatically imbue a judge with the expertise needed to address all its intricacies. Particularly in matters relating to national security, a judge's inclination to substitute his judgment for that of qualified experts in the Executive branch can be pernicious. "If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully." *New York Times Co. v. United States,* 403 U.S. 713, 728–29, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Powell, J., concurring).

That is to say, while our constitutional scheme provides judges with the clear responsibility to adjudicate narrowly-drawn constitutional questions, it does not offer us license independently to assess the wisdom or the necessity of internal Department of Defense policies and to pass judgment thereon. Without clear congressional authorization, courts traditionally have demonstrated a reluctance to encroach on Executive prerogative in the area of military and national security affairs. *See, e.g., Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Schlesinger v. Councilman,* 420 U.S. 738, 757–58, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975);

*Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973); *Burns v. Wilson,* 346 U.S. 137, 142, 144, 73 S.Ct. 1045, 1048, 1049, 97 L.Ed. 1508 (1953); *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). It is not for us, as it was not for the District Court, to justify our conclusions by inferences drawn either from world events—such as the breakup of the Soviet Union weighed by the District Court in determining the public interest component of the preliminary injunction—or from prior agency policy, that is, the Defense Department's earlier failure to conduct periodic reinvestigations for secret clearances. Such bases for judicial decisions run perilously close to political judgments about foreign policy, which, under Article II of the Constitution, are committed to the Executive alone.

I do not understand our decision today to abandon our tradition of deference to the Executive on matters regarding national security and note that the determination of trustworthiness is an "inexact science at best," *Adams v. Laird,* 420 F.2d 230, 239 (1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1360, 25 L.Ed.2d 650 (1970).

As I do not understand the Court's opinion today to be inconsistent with these considerations, I concur.