**UNITED STATES of America**

v.

**Christopher WILLIAMS, Appellant.**

No. 91–3071.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 8, 1991.

Decided Dec. 27, 1991.

Rehearing Denied Feb. 27, 1992.

G. Godwin Oyewole, Washington, D.C., for appellant.

Linda Otani McKinney, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before EDWARDS, WILLIAMS and RANDOLPH, Circuit Judges.

RANDOLPH, Circuit Judge:

When a district court's ruling on a pretrial motion involves factual issues, Rule 12(e) of the Federal Rules of Criminal Procedure commands the court to "state its essential findings on the record." The rule serves several functions. Findings on the record inform the parties and other interested persons of the grounds of the ruling, add discipline to the process of judicial decision-making and enable appellate courts properly to perform their reviewing function. If the district court not only fails to make "essential findings on the record," but also expresses nothing in the way of legal reasoning, if it simply announces a result, it may frustrate these objectives. We say "may" because there are cases in which the facts are so certain, and the legal consequences so apparent, that little guesswork is needed to determine the grounds for the ruling. This is not such a case.

Before trial, Christopher Williams unsuccessfully moved to suppress evidence that ultimately resulted in his conviction by a jury for possessing, with intent to distribute, cocaine in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B)(iii). The only witnesses at the suppression hearing were two officers (Marsh and Wasserman) of the United States Park Police. The district court viewed both of them as "credible"— the full extent of the court's findings on the record. As best as we can make out from their testimony, the events leading to the search and arrest of Williams are as follows.

Officer Marsh, travelling with six or seven fellow narcotics officers in an unmarked van early one summer evening, looked out the front window and spotted Williams as the van was returning to the station. 10/2/90 Transcript of Motion to Suppress ("Tr.") at 4–5, 36. Williams was with another individual. Tr. 6. Both appeared nervous. *Id.* The area was known for narcotics trafficking. Tr. 8. Officer Marsh said he saw Williams take a "small object" out of his pocket and hand it to his companion, who then gave Williams a "small object." Tr. 7. Officer Marsh was between 25 and 75 feet away. *Id.* Either he could not tell what "specifically" was being exchanged or he saw Williams hand over a "dime size" or "quarter size" object having a "glassy appearance" similar to crack cocaine. Tr. 16–17, 7. He thought the object Williams' received was either "the size of U.S. currency" or of a bill folded in half. Tr. 17, 7.

As the van proceeded past Williams, Officer Marsh turned around and said "Did you see that? That guy just sold to the other guy." Tr. 37. At Officer Marsh's request, the van came about and returned to the scene. Tr. 9. Because Sergeant Wasserman was "one of the few people in the unit who had some success in engaging in foot chases after people," Officer Marsh asked him to go after Williams. Tr. 39. When the van stopped, five officers exited. Officer Wasserman ran to Williams. Tr. 30. He identified himself as a police officer, ordered him to put his hands in the air and keep them there and said that another officer needed to speak with Williams back at the van. *Id.;* Statement of Facts of Officer John Marsh (June 15, 1990). (Officer Marsh was busy arresting two other individuals unconnected with this case. Tr. 25.) Williams protested that he was the "wrong guy," adding that the officer could "check [him]." Tr. 31. Sergeant Wasserman declined for the moment, and escorted Williams back to the van and Officer Marsh. Tr. 32. The Sergeant said he could not recall whether he had his gun drawn and pointed at Williams' head. Tr. 44. During the walk back, Sergeant Wasserman saw the corner of a ziplock bag

protruding from one of Williams' pockets. *Id.* Officer Marsh, on seeing Williams, said "yes" and gave a "wave-of-hand" signal, which Sergeant Wasserman took as confirming that Williams was in fact the individual Officer Marsh wanted stopped. Tr. 13, 32. At that point, Sergeant Wasserman removed the ziplock bag from Williams' pocket. Tr. 33. It contained a substance that looked enough like cocaine to warrant a field test, and in fact proved to be cocaine when tested. Tr. 33–34. Williams was formally arrested either just before or just after the field test. Tr. 52. Sergeant Wasserman explained that he took the bag from Williams "based on Investigator Marsh's indication that Mr. Williams was, in fact, the person he wanted stopped and Mr. Williams' own statements to me numerous times that I could check him...." Tr. 33. No cash was discovered on Williams. Tr. 25.

At the close of the hearing the district court stated:

> First, the court finds the testimony of the officers to be quite credible and consistent with reason and experience.
>
> I see no problem with what happened here. It's another escalating street scene which must be viewed considering the totality of the circumstances.
>
> And the court sees nothing constitutionally impermissible in what happened and, accordingly, denies the motion to suppress.

Tr. 59.

██ We will sustain factual findings unless they are "clearly erroneous," a standard we imported from the civil rules for cases tried to the court (Fed.R.Civ.P. 52(a)) because the rules of criminal procedure were silent on the matter. *See Jackson v. United States,* 353 F.2d 862, 864–65 (D.C.Cir.1965). Also, we will review *de novo* "whether the correct rule of law has been applied to the facts found." *United States v. Hinckley,* 672 F.2d 115, 119 (D.C.Cir.1982), *overruled in part on other grounds, Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), *quoting Compana Corp. v. Harrison,* 114 F.2d 400, 406 (7th Cir.1940). The problem we

have in this case is twofold. We do not know which facts the district court considered "essential" to its ruling and we do not know what principle of Fourth Amendment law the court believed supported its ruling.

The record suggests three possible grounds on which the district court could have ruled. The first is consent. Sergeant Wasserman's reason for searching Williams sounds like he thought he had consent—Williams said check me out. But the government never raised the issue of consent in the district court. Did the district court nevertheless rule on that basis? The district court's "finding" that Sergeant Wasserman was credible may suggest as much, but we do not know. Before us, Williams argues that his consent was not voluntary. The government counters that he waived the argument by failing to raise it, a curious response indeed, one that makes sense only if the district court ruled on a ground—consent—the government itself may have waived by not raising. *See Giordenello v. United States,* 357 U.S. 480, 488, 78 S.Ct. 1245, 1251, 2 L.Ed.2d 1503 (1958).

The second possibility is that the district court believed the removal of the bag was a search incident to arrest. This would require the initial detention of Williams to be supported by probable cause. Even crediting fully Officer Marsh's testimony, we are inclined to doubt that what he saw from the window of the moving van amounted to probable cause for arrest. While the district court could have concluded that an arrest occurred when Williams was first approached, all of the testimony at the hearing centered on the question whether the arrest took place immediately prior to or just after the field test. Tr. 52.

██ The third possibility begins with the proposition that this was a limited, investigative detention supported by articulable, reasonable suspicion—in short, a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). On appeal the government tells us that Sergeant Wasserman was justified in stopping Williams in light of what Officer Marsh

had seen. It is true that knowledge possessed by one officer is presumed to be shared by all others cooperating in the investigation. *Illinois v. Andreas,* 463 U.S. 765, 771–72 n. 5, 103 S.Ct. 3319, 3324, n. 5, 77 L.Ed.2d 1003 (1983); *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971). Thus, it may be of no moment that Sergeant Wasserman did not know the exact extent of Officer Marsh's observations. A variant of this possibility is that probable cause developed after the *Terry* stop. On this theory, what Officer Marsh saw, and conveyed, permitted Sergeant Wasserman to detain Williams. During the lawful scope of that detention, Sergeant Wasserman saw the plastic bag and thought it indicative of narcotics-related activity. He then put two and two together and came up with probable cause. While it may be that Sergeant Wasserman did not bother to count—or add—because he thought he had Williams' consent, the facts within his knowledge could still justify a finding that probable cause existed when he confiscated the bag. *See Scott v. United States,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978).

The problem with any theory based on a *Terry* stop, however, is that there is no indication the government ever argued *Terry* until the case arrived here. At oral argument in the district court, the prosecutor claimed that the police "had probable cause to stop and arrest the defendant" (Tr. 57); defense counsel argued "that there was no probable cause to stop [Williams]" (Tr. 56). "This Court sits as a court of review. It is only in exceptional cases ... that questions not pressed or passed upon below are reviewed." *Duignan v. United States,* 274 U.S. 195, 200, 47 S.Ct. 566, 568, 71 L.Ed. 996 (1927). Though Justice Stone was writing of the Supreme Court, the considerations underlying the rule have force for the courts of appeals as well, and "the general rule [is] that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We know the *Terry* stop argument was "not pressed ...

below"; we cannot tell whether it was nevertheless "passed upon." *Duignan,* 274 U.S. at 200, 47 S.Ct. at 568. If the district court thought this was a *Terry* stop, and justified as such, presumably the court could have ruled that removing the bag from Williams' pocket was within the scope of an investigative detention. To our knowledge no case in this circuit goes so far; in light of *Sibron v. New York,* 392 U.S. 40, 64–65, 88 S.Ct. 1889, 1903–04, 20 L.Ed.2d 917 (1968), and *United States v. Place,* 462 U.S. 696, 705–06, 103 S.Ct. 2637, 2643–44, 77 L.Ed.2d 110 (1983), there may be no room for such an extension. Or, as we have said, the court could have found that the sight of the bag was enough to turn reasonable suspicion into probable cause—to justify turning a detention into an arrest and a search.

The possibilities outlined above pose several Fourth Amendment questions, which may not be open and shut in light of the evidence we have recited. Perhaps the district court, in its mind, decided all of these questions against the defendant; perhaps it sustained the search and arrest on a narrow basis; perhaps on an erroneous one. The purpose of an appeal is to review the judgment of the district court, a function we cannot properly perform when we are left to guess at what it is we are reviewing. Given this situation, the obvious solution is to send the case back.

Our only hesitation in remanding stems from *United States v. Caballero,* 936 F.2d 1292 (D.C.Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113, and several earlier decisions, which indicate that we will sustain a district court's denial of a motion to suppress, despite the court's failure to comply with Rule 12(e), "if there is any reasonable view of the evidence that will support it." *Scarbeck v. United States,* 317 F.2d 546, 562 (D.C.Cir.), *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963), *cited in Caballero,* 936 F.2d at 1296. The stated rationale is that Rule 12(e) confers on the litigants a personal "right" to have factual findings made, and that "failure to object" to a lack of findings "results in waiver." *Caballero,*

936 F.2d at 1296. This has the effect of denying defendants (and the government if it should appeal the granting of a suppression motion) a windfall when the trial court omits a finding apparent on the face of the record, *see, e.g., United States v. Williams,* 822 F.2d 1174, 1177 & n. 39, 1179 & n. 61 (D.C.Cir.1987), or when, under any possible view of the record, the district court could have reached but one result. *See, e.g., United States v. Lindsay,* 506 F.2d 166, 170–74 (D.C.Cir.1974).

 One might wonder why, when there has been such a "waiver," it should follow that we will uphold the district court's decision if "any reasonable view of the evidence" supports it, *Scarbeck,* 317 F.2d at 562. The idea, at least as *Caballero* expresses it, is that the district court, in reaching its legal conclusion, presumably made whatever factual findings were needed to support the conclusion. Denying a remand because of "waiver," then, means we review facts we infer were actually, albeit silently, found. Our practice of using the "any-reasonable-view-of-the-evidence" standard means that we review those implicit findings under what may be, for all practical purposes, the equivalent of the "clearly erroneous" test we apply to "essential findings" explicitly made in compliance with Rule 12(e). *Caballero* and its antecedents thus rest on two assumptions. One, that the district court asked the right legal questions in making its ruling; two, that it actually weighed the evidence bearing on the facts needed to answer them. When, in a particular case, there is reason to doubt the validity of either or both those assumptions, the court may dispense with what *Caballero* seemingly requires, and remand the case to the district court. *See United States v. Jordan,* 951 F.2d 1278 (D.C.Cir.1991); *see also United States v. Prieto–Villa,* 910 F.2d 601, 606–10 (9th Cir. 1990); *United States v. Castrillon,* 716 F.2d 1279, 1282–83 (9th Cir.1983).

If we knew the district court's legal reasoning in this case, we might have little difficulty in ascertaining the pertinent but unstated findings underlying it, as did the *Caballero* court. If we knew what facts the district court considered "essential" to its ruling (Rule 12(e)), we might be able to piece together the unstated legal grounds for its decision. But we have neither essential findings nor legal reasoning. As Chief Justice Hughes wrote, "it is always desirable that an appellate court should be adequately advised of the basis of the determination of the court below...." *Public Service Comm'n v. Wisconsin Tel. Co.,* 289 U.S. 67, 69–70, 53 S.Ct. 514, 515, 77 L.Ed. 1036 (1933). Here the "desirable" is the necessary. Accordingly, we will exercise our inherent power to supervise the district courts. 28 U.S.C. § 2106; *see United States v. Talkington,* 843 F.2d 1041, 1042 (7th Cir.1988); *United States v. West,* 723 F.2d 1, 3 (1st Cir.1983); *In re FTC Line of Business Report Litig.,* 626 F.2d 1022, 1028 & n. 34 (D.C.Cir.1980), in part *quoting* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2575, at 694 (1971); *Camacho v. United States,* 392 F.2d 575, 576 (9th Cir.1968); *Von Der Heydt v. Rogers,* 251 F.2d 17 (D.C.Cir. 1958). The record is remanded for the factual findings required by Rule 12(e) as well as a statement by the district court of the conclusions of law it has reached on those findings. This panel will retain jurisdiction over the case following remand.

*It is so ordered.*