UNITED STATES of America

v.

Christopher WILLIAMS.

Crim. No. 90–283 SSH.

United States District Court,
District of Columbia.

March 12, 1993.

Linda Otani McKinney, Asst. U.S. Atty.,
Washington, DC, for plaintiff.

G. Godwin Oyewole, Washington, DC, for
defendant.

OPINION

STANLEY S. HARRIS, District Judge.

This case now is before this Court on remand from the Court of Appeals, which directed the making of findings of fact and conclusions of law.[1]  *United States v. Williams*, 951 F.2d 1287 (D.C.Cir.1991).

*Introduction*

This case, quite unexceptional as to its facts as it arises from a routine street drug

---

1. This Court regrets the amount of time which has passed since the issuance of the slip opinion by the Court of Appeals (dated December 21, 1991). Of course, the pendency of an appeal divests this Court of jurisdiction over a case, and it was expected (wrongly, as it developed) that something other than the slip opinion would be issued by the Court of Appeals (*i.e.*, some sort of mandate). After the passage of quite some time, an inquiry to the Clerk's Office of the Court of Appeals revealed that nothing else would be forthcoming from that court.

In the interest of efficiency, this Court then appointed the lawyer who had represented defendant on appeal to represent him on the remand, and held a status hearing on May 29, 1992. Proposed findings of fact and conclusions of law were requested, and they were duly filed in June and late July 1992. The ever-present pressure of other matters which weigh so heavily on a daily basis on all trial judges, including in the undersigned's situation a multi-defendant criminal trial which lasted more than three months, delayed the completion of this opinion for an undesirably long period of time. Nonetheless, it respectfully is noted that in this Court's opinion, the appeal readily could (and should) have been resolved by the Court of Appeals when it first considered this case, which would have obviated not only any further delay but also extensive work on the part of the undersigned, the United States Attorney's Office, and defense counsel.

transaction, now is in an extraordinary posture as a consequence of the opinion ordering a remand. This Court has deliberated long as to what approach to take in dealing with the directive of the Court of Appeals. The file simply could have been studied; one or the other side's proposed findings of fact and conclusions could have been modified or even simply adopted; and the matter would have ended. However, considerably more is at issue here. The panel of the Court of Appeals decided that it "will exercise our inherent power to supervise the district courts." *Id.* at 1291. In doing so, it concluded: "The record is remanded for the factual findings required by [criminal] Rule 12(e) as well as a statement of the conclusions of law it has reached on those findings." *Id.* On close analysis, the opinion of the Court of Appeals appears to be directed more towards what this judge did than to the overall record on appeal. On the other hand, the panel may have intended for its opinion to have a watershed effect on the entire trial court's future handling of suppression motions.

Obviously, the Court of Appeals and the District Court have significantly different roles to play. Nonetheless, they are partners in the administration of justice. That being true, in a unique situation a District Judge may feel obliged to express serious concern as to the potential consequences of an appellate opinion while dealing with a case on remand, so that differing views may be exposed for consideration in the overall legal community. That is true here, in part (as would be normal) because the panel which decided the case "will retain jurisdiction over the case following remand." 951 F.2d at 1291. Due to a genuine concern as to the potential impact of what the Court of Appeals has done in this case, this Court has decided to set forth its views in a manner which is intended to be both respectful and constructive.

*The Federal Rules of Procedure*

All "inferior Courts" created under Article III of the Constitution are ones of limited jurisdiction; the majority of their powers are those which are conferred upon them by Congress. Article III courts are bound by the Federal Rules of Criminal (and Civil) Procedure, the Federal Rules of Evidence, and the Federal Rules of Appellate Procedure. Those rules have the effect of law, and there is a statutory manner by means of which they are to be promulgated (and, obviously, amended). *See* 28 U.S.C. §§ 2072–76. One rule tells trial judges what they are to do after a hearing in a criminal case on a motion such as a motion to suppress: "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record." Fed. R.Crim.P. 12(e). More is required when a trial court issues a temporary restraining order or a preliminary injunction in a civil case (*see* Fed.R.Civ.P. 65(d)). If a district judge conducts a non-jury civil trial, the court is obliged to "find the facts specially and state separately its conclusions of law thereon...." Fed.R.Civ.P. 52(a).[2] It is not believed that any other federal rule of civil or criminal procedure requires a trial judge to make findings or conclusions.

*What Happened in This Case*

This case developed in an unexceptional way. An arrest was made as an outgrowth of the observation of a street drug sale; an indictment was returned; a motion to suppress the evidence was filed by defense counsel; an opposition pleading was filed by the Government; a hearing was held on the motion; and the motion was denied. There were only two witnesses who testified at the suppression hearing; both were police officers. Their testimony was consistent and uncontradicted. This Court had two basic responsibilities. The first was to decide if the officers' testimony was credible; the second was to determine if the search and sei-

---

**2.** Specifically exempt from the requirement of findings of fact and conclusions of law in civil cases are a trial judge's rulings on motions for summary judgment and for judgment on the pleadings. The reason for this is obvious; the standard of review by the Court of Appeals is *de*

*novo,* and hence it basically is immaterial for appellate review purposes why a trial judge ruled as he or she did on such a motion. (It is axiomatic that trial judges, unlike administrative law judges, may be "right" for the "wrong" reason.)

zure which led to defendant's arrest were "unreasonable" and hence violative of the Fourth Amendment.

There is, of course, nothing unique about having the testimony of officers provide the factual framework within which a case is decided. More than 25 years ago, a Court of Appeals' majority comprised of the late Judges Bazelon and Wright recognized that: "Normally, as an appellate court, we accept the testimony of police officers and other witnesses credited by the trial court." *Jackson v. United States*, 353 F.2d 862, 866 (D.C.Cir.1965).

After hearing the testimony of the officers and the brief arguments of counsel which were presented immediately thereafter, the undersigned stated simply:

> First, the court finds the testimony of the officers to be quite credible and consistent with reason and experience.

> I see no problem with what happened here. It's another escalating street scene which must be viewed considering the totality of the circumstances.

> And the court sees nothing impermissible in what happened and, accordingly, denies the motion to suppress.

When the facts are uncontroverted, as they were here, such an abbreviated manner of resolving a motion to suppress has been used by the undersigned (and, indeed, by many other trial judges) without criticism by the Court of Appeals for years.

Let me digress to describe how trial judges typically get to the point of decision in suppression matters. A defense counsel talks to his or her client (in many cases not getting a complete or accurate version of the events) and obtains discovery from the United States Attorney's Office, after which a motion to suppress is filed. An Assistant United States Attorney talks to the officers and files an opposition pleading. Neither side knows for sure what direct and cross-examination will reveal when the hearing is held. The undersigned's suppression hearings generally are scheduled for 5:00 p.m., so as not to interfere with an ongoing trial. Notes are taken during the hearing, but this trial judge—presumably like most—has no shorthand skills, and the notes are imperfect. (While of course a court reporter is present to make a record of the proceeding, no transcript is available to the trial judge.)

█ Given this procedure, and the requirements of the Federal Rules of Criminal Procedure, discussed *infra*, I respectfully suggest that the approach taken in this case is not only acceptable, but also desirable. Where there is no disagreement as to the facts, and a finding of credibility has been made, nothing can be gained by a trial judge's restatement of the testimony based upon his hearing notes and his recollection.

As to the law, it is absolutely true that no two Fourth Amendment cases are exactly alike. From as far back as the multiple opinions in the case of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), there is always the proverbial something for everybody in cases dealing with the Fourth Amendment.[3] To expect overburdened trial judges to be able to make a detailed exposition of the case law from the bench immediately following the presentation of testimony at a suppression hearing would be to expect the impossible.[4]

**3.** Illustratively, in a Fourth Amendment opinion issued approximately one month after the panel opinion in this case, the author of both opinions found it appropriate to cite more than 50 cases during his analysis of the issues. *United States v. Six Hundred Thirty–Nine Thousand Five Hundred & Fifty–Eight Dollars in United States Currency*, 955 F.2d 712 (D.C.Cir.1992).

**4.** Of course, in some non-routine cases, particularly with contested facts, trial judges do take suppression motions under advisement, ask their reporters to give them partial or full transcripts, and write opinions.

The infeasibility of this procedure as a regular practice should not be underestimated, however. We have more criminal cases than we can handle, and it is believed that all trial judges in this District feel great frustration at their inability to devote more sorely needed time to their civil cases. The requirements of the Speedy Trial Act, tolled by the pendency of motions such as one seeking the suppression of physical evidence or statements, force trial judges to schedule hearings on suppression motions for just a few days before the trial date. (Some judges, not including the undersigned, regularly schedule suppression hearings for the morning of trial.)

It is in recognition of factors such as these that the requirements of Rule 12(e) of the Federal Rules of Criminal Procedure are quite limited, and in no sense approach what has been ordered by the panel opinion in this case.

■ There is nothing obtuse about the relevant provision of Rule 12(e), when it is read without embellishment and characterized accurately. It provides quite simply: "Where factual issues are involved in determining a motion, the court shall state its essential findings on the record." If there are witnesses whose testimony is uncontradicted, the trial judge must determine whether the testimony is credible. If the trial judge so finds, the testimony provides the facts. When there is a conflict in the testimony of witnesses, with opposing versions of what happened, the trial judge must resolve that conflict (to the extent that the conflict is material), and its factual findings (obviously then "essential") provide the framework in the context of which the legality of the challenged action is evaluated.

Rule 12(e) is conspicuously (and obviously deliberately) silent as to non-essential "findings of fact" and conclusions of law. Assuredly, a legal conclusion must be reached as to whether the subject motion is granted or denied, but any suggestion that conclusions of law must be expressed is as non-existent as it is infeasible. It is doubted that there is any area of contemporary law with as many, and as varied (and indeed inconsistent), opinions as there are with respect to the Fourth Amendment. Trial judges, with no transcripts over which to deliberate, and little time for extensive research (which likely would be rather unproductive, even if it could be undertaken) are foot soldiers in the administration of the criminal justice process; appellate judges, as the often-used phrase puts it, then have the luxury of coming in and shooting the wounded.[5]

It is respectfully submitted that the appellate panel has failed to appreciate Rule 12(e)'s limitations and has misunderstood its purpose. The panel has characterized the purposes of the Rule as follows:

> When a district court's ruling on a pretrial motion involves factual issues, Rule 12(e) of the Federal Rules of Criminal Procedure commands the court to "state its essential findings on the record." The rule serves several functions. Findings on the record inform the parties and other interested persons of the grounds of the ruling, add discipline to the process of judicial decision-making and enable appellate courts properly to perform their reviewing functions. [951 F.2d at 1288.]

There is no valid basis for these assertions. The Court of Appeals in recent years has accorded trial court rulings less and less deference, while paradoxically placing more and more burdens on trial judges. As one consequence of that circumstance, the legal conclusions reached by a trial judge in a suppression hearing are reviewed *de novo*. Thus, illustratively, the Court of Appeals now considers that "whether a seizure occurred is a legal conclusion that this court reviews *de novo*." *United States v. Jordan*, 958 F.2d 1085, 1086 (D.C.Cir.1992). Additionally, although it was dissatisfied with the undersigned's handling of the case, the panel in this case nonetheless stressed that "we will review *de novo* 'whether the correct rule of law has been applied to the facts found.'" 951 F.2d at 1289. What, then, is there for the trial judge? The answer: to fulfill its classic role as arbiter of the facts, as is specifically contemplated by Rule 12(e) of the Federal Rules of Criminal Procedure, and to make a determination as to whether the search and seizure were constitutional. There simply is no requirement that the trial judge meet the supposed goals set forth in the panel opinion.

---

5. The panel's intimation that it (and its resolution of an issue) somehow may be limited by the arguments made by counsel at the end of the suppression hearing not only is unsupported by law, it is inconsistent with the manner in which such arguments are made. Both counsel, like the trial judge, have just heard the actual testimony for the first time, and address the trial judge immediately—without further reflection, preparation, or research. The arguments typically are truncated; justice would be poorly served indeed if a trial judge's ruling could be upheld based only on what was or was not said by counsel at that juncture.

## Civil and Criminal Cases Are Not Fungible

One point needs to be made. It must be recognized that civil cases and criminal cases are not fungible for a multiplicity of reasons. This would seem unnecessary to state, but the panel opinion flits so casually from civil cases to criminal cases for precedent as to require making this point. Obviously, if the differences were not great, there might be no need for one set of Federal Rules of Civil Procedure and another set of Federal Rules of Criminal Procedure. To be more specific, Rule 52(a) of the Federal Rules of Civil Procedure requires a trial judge to make findings of fact and conclusions of law after a non-jury civil trial has been conducted. By contrast, as has been noted, Rule 12(e) of the Federal Rules of Criminal Procedure calls for a trial judge to make nothing more than "essential findings" when "factual issues are involved in determining" a pretrial motion on which a hearing has been held in a criminal case.

Nonetheless, not only does the panel opinion rely on civil cases, it does so while placing reliance upon civil cases in which the Supreme Court has been directing its comments to intermediate courts of appeals. Perhaps nowhere in the panel opinion is a slight variation of this extraordinary technique better illustrated than in the panel's ultimate conclusion:

> But [here] we have neither essential findings nor legal reasoning. As Chief Justice Hughes wrote, "it is always desirable that an appellate court should be adequately advised of the basis of the determination of the court below...." *Public Service Comm'n v. Wisconsin Tel. Co.*, 289 U.S.

67, 69–70 [, 53 S.Ct. 514, 515, 77 L.Ed. 1036] (1933). Here the "desirable" is the necessary. Accordingly, we will exercise our inherent power to supervise the district courts. [951 F.2d at 1291.]

It is true, of course, that the words attributed to Chief Justice Hughes were written. However, that was done in a civil case in which a three-judge court issued an interlocutory injunction without saying why it had reached its decision to do so. Additionally, that language was written before the adoption of the Federal Rules of Civil Procedure; the conclusion thus expressed by the Supreme Court now is one of the specific requirements set forth in Rule 52(a) of the Federal Rules of Civil Procedure. No purpose would be served by speculating as to why the Court of Appeals reached so far in an effort to support what it has done in this case; suffice it to say that the cited language has no relevance to the requirement of "essential findings" established by Rule 12(e) of the Federal Rules of Criminal Procedure for rulings on a motion such as one seeking suppression.

## The Court of Appeals Lacks the "Inherent Power" To Do What It has Done Here

As quoted above, the panel decided that "we will exercise our inherent power to supervise the district courts." 951 F.2d at 1291. The panel then cites a number of authorities for such a proposition, none of which, it is respectfully suggested, supports the existence of such a broad power.[6]

Nor can this Court find any support for the existence of an "inherent supervisory power."[7] The Random House Dictionary of the English Language defines "inherent" as:

---

**6.** As has been noted, Article III courts are recognized to be courts of limited jurisdiction, and the courts of appeals assuredly have no statutory power to "supervise" district courts. In seeking to support the existence of such a power, the panel cited 28 U.S.C. § 2106 and a number of cases that support an appellate court's authority to order further findings from a trial court when necessary for appellate review (again, however, citing civil as well as criminal cases). As noted, because the panel's review of the undersigned's legal conclusion is *de novo*, and because the undersigned made the requisite "essential" factual finding, with the testimony presented during the suppression hearing thus providing the evidence, further elucidation was not necessary for appellate review.

**7.** The Supreme Court has referred to "our supervisory power over the federal courts." *See Lowenfield v. Phelps*, 484 U.S. 231, 239 n. 2, 108 S.Ct. 546, 551 n. 2, 98 L.Ed.2d 568 (1988). Such a power is conferred by statute, subject to reporting to Congress. *See* 28 U.S.C. § 2072.

This Court recognizes that the Court of Appeals did, in a 5–4 decision in *United States v. Thomas*, 449 F.2d 1177 (D.C.Cir.1971) (en banc), purport to "exercise ... our supervisory power over the administration of the law in this cir-

"existing in something as a permanent and inseparable element, quality or attribute." This scarcely characterizes the relationship between the two courts.[8]

Some 30 years ago, a respected former member of this court expressed rather strong feelings about an opinion which had been issued by the Court of Appeals. *See United States v. Naples,* 205 F.Supp. 944 (D.D.C.1962). After noting that intermediate appellate courts came along centuries after there were trial courts, the late Judge Holtzoff stated:

> They [appellate courts] have an important function to perform, namely, so to speak, to take a second look at a case, in order that a litigant would have the advantage of the decisions of two courts. They are not necessarily superior in wisdom or scholarship. They have the disadvantage of not seeing the litigants, but having only a printed or typewritten transcript of what occurred at the trial. Their sole function is to affirm, reverse, or modify the decision of the trial court, and not to supervise or censure trial judges. To be sure, the phrase "supervisory jurisdiction" has occasionally been used in recent years. This is a picturesque and apt figure of speech and, as such it has its usefulness, but like figures of speech generally it must not be taken seriously or literally. Strictly speaking, intermediate appellate courts have no supervisory jurisdiction. [*Id.* at 946.]

One need not specifically concur in those observations of Judge Holtzoff to recognize the infirmities in what is being done in this case, in which both courts are functioning within the context of a specific federal rule. Former Circuit Judge Starr wrote a concurring opinion in *United States v. Daniels,* 770 F.2d 1111, 1119 (D.C.Cir.1985), upon which it would be difficult to improve from the standpoint of diplomatic phraseology. He stated in part:

While refusing to adopt appellant's proposed bright line rule of automatic severance, the court clearly views our supervisory powers as sufficiently broad to permit such a result. I am troubled by the proposition that the inherent supervisory powers of the federal courts permit Courts of Appeals to sit as roving supervisors of the federal trial bench, shaping rules to meet felt needs of one sort or another as they arise, even where a specific rule of procedure expressly controls the issue. Federal Rule of Criminal Procedure 14 speaks authoritatively to the trial courts' broad discretion in ruling on severance motions. The notion that this court is empowered to fashion a supervisory rule in an area already governed by a rule promulgated by the Judicial Conference and Congress is, to my mind, unsettling. The Judicial Conference and, ultimately, the Congress itself have occupied this field, as it were, thus counseling restraint in judicially legislating in an area already addressed authoritatively by the judiciary's policy-making body and the Article I branch. [*Id.*]

The panel opinion stated that the record in this case has been "remanded for the factual findings required by Rule 12(e) as well as a statement by the district court of the conclusions of law it has reached on those findings." 951 F.2d at 1291. As noted, this Court respectfully considers it to be clear that Rule 12(e) does not require broad factual findings, but rather only "essential findings," and that the essential finding here—simply that the testimony of the officers was credible, making that testimony the factual record—has been made. Similarly, this Court made the ultimate finding that the search and seizure in this case were not constitutionally impermissible under the Fourth Amendment. (Rule 12(e) contains no reference to conclusions of law, although obviously an ultimate

---

cuit." *Id.* at 1187. No authority was cited for that power, which in any event is meaningfully different from the "inherent power to supervise the district courts" which is claimed here. No present member of the Court of Appeals was a part of the *Thomas* majority, which basically asserted supervisory power as a technique to prevent the future use of the so-called *Allen* charge in instructing a jury. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The *Thomas* dissenters, in this Court's

opinion, were correct in "declin[ing] to exalt the recommendation of the Bar Association over the decisions of the Supreme Court of the United States.", *Id.* at 1188, 1192 (Robb, J., dissenting).

**8.** This court, like any other court, regularly manages to adopt or amend its own rules without seeking any supervisory approval or other input from the Court of Appeals.

"finding" of constitutionality could be so characterized.)

Irrespective of whether the Court of Appeals may have the "inherent power to supervise the district courts" (an extraordinarily broad claim indeed), quite clearly it has no power to disregard or amend the Federal Rules of Criminal Procedure in the guise of such an assertedly broad supervisory power. Nonetheless, of course, if anyone—including the members of the panel of the Court of Appeals—believes that the requirements of Rule 12(e) should be enlarged, amendment of the Rules may be sought as authorized by statute. *See* 28 U.S.C.A. § 2073. (If such a route were followed, the process *inter alia* would permit overburdened trial judges to oppose any unneeded expansion of the Rule.)

*Conclusion*

■ It was mentioned at the outset that a close reading of the panel opinion seems to indicate that its applicability should not extend beyond this case, notwithstanding the panel's broad reliance on what it claims to be "our inherent power to supervise the district courts." 951 F.2d at 1291. Reinforcing that belief is the fact that on the same day on which the decision was issued in this case, another panel of the Court of Appeals issued its opinion in *United States v. Mitchell*, 951 F.2d 1291 (D.C.Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992). In that case, unlike this one, there were factual disputes. After resolving them in a cursory fashion, the trial judge did essentially the same thing that the undersigned did in this case. In *Mitchell*, however, the denial of the suppression motion was affirmed. In speaking of Rule 12(e), that panel of the Court of Appeals stated:

> Mitchell contends that the judge must address all of the factual disputes that arose during the hearing—the brevity of her holding makes meaningful appellate review impossible. Thus, Mitchell urges reversal or remand.
>
> Mitchell, however, failed to object to the sufficiency of the judge's findings at the

suppression hearing; nor did he ask the court to amplify them. We find, therefore, that he waived this objection. * * * In the absence of explicit findings, we will uphold the trial judge's findings under Rule 12 "if proper for any reason." * * * As it is implicit in her ruling that the judge found the search valid under a *Terry* theory and that she resolved the credibility questions in favor of the officers, we see no need for a remand. [*Mitchell*, 951 F.2d at 1299 (citations omitted).]

Faced with the panel decision in this case, this Court had two choices: (1) it could simply follow the panel like a lemming over a cliff, or (2) it could state its analysis for the benefit of others who may be dealing with the same issues in the future. To the undersigned, the only principled choice was the latter. District Judges, like Circuit Judges, take an oath to support the laws of the United States. The Federal Rules of Criminal Procedure are part of those laws, and it is sincerely believed that no concept of "inherent" appellate "supervisory power" permits them to be contravened so casually. This Court accordingly has taken the concededly hard way out of the dilemma which it has been forced to face, dealing substantively with what it perceives to be serious problems presented by the panel opinion.

Despite these sincere beliefs, which this Court has sought to state with full respect, it recognizes that hierarchically it is an inferior court. As such, although it feels not only free but obliged to express its views, it recognizes that it is bound by the panel's ruling. Consistent therewith, attached hereto as Appendix A are the Court's Findings of Fact and Conclusions of Law on Remand.[9]

### APPENDIX A

[Criminal No. 90–238 SSH]

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
ON REMAND

Pursuant to the opinion of the Court of Appeals issued in this case on December 27,

---

9. As would be expected from the Court's prior essential finding of the officers' unchallenged testimony as credible, and its conclusion that there was no violation of the Fourth Amendment (the case presents a clear example of a valid

*Terry* stop which escalated into probable cause), the findings and conclusions which are appended are largely adopted from those which were proposed by the Government.

1991, this Court makes its findings of fact and conclusions of law.[1]

On July 3, 1990, a grand jury indicted defendant for possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B)(iii).[2] On October 2, 1990, defendant's motion to suppress evidence was heard and denied by this Court. A jury trial commenced on October 3, 1990, and concluded when the jury rendered a guilty verdict on October 5, 1990. A timely notice of appeal was filed on February 12, 1991. As noted, the Court of Appeals remanded the case to this Court for factual findings and conclusions of law regarding the suppression motion hearing.[3]

*Findings of Fact*

On June 14, 1990, at approximately 7:00 p.m., Officer John Marsh, who had participated in roughly 1,000 narcotics arrests, was riding in an unmarked surveillance van carrying six to seven police officers when he spotted defendant on the northwest corner of Ridge Road and D Street, S.E., in Washington, D.C. Defendant was approached by another individual, and the two looked around nervously as if to determine whether they were being watched. Defendant then took a "dime size" or "quarter size" object having a "glassy appearance" similar to the typical packaging for crack cocaine from his left pocket. He then handed it to the other individual in exchange for something that looked like United States currency.

The van was traveling west along Ridge Road at about 25 miles per hour. Officer Marsh was standing by the sliding door on the side of the van looking out the front window. Officer Marsh explained that it was a summer evening with plenty of light outside, his view was unobstructed, and that he was between 25 and 75 feet away from defendant at the time he was observing him.

Knowing that narcotics were frequently sold in this area (from having participated in ten to 15 arrests himself at the same location), Officer Marsh informed Sergeant Jeffrey Wasserman, who was seated in the back of the van, of what he had just observed. Sergeant Wasserman gave permission to stop defendant and Investigator Keenan, who was driving, turned the van around. Officer Marsh gave a description of defendant as a black male with facial hair, wearing a blue and white striped polo shirt and blue jeans.

After the van turned onto D Street, Officer Marsh pointed defendant out to Sergeant Wasserman. When the van came to a stop, Sergeant Wasserman walked directly towards defendant. Defendant was talking to someone, but he immediately turned around and walked in the opposite direction as the sergeant approached him.

Sergeant Wasserman ran up to defendant, identified himself as a police officer, and

1. This Court's accompanying Opinion makes clear its conviction that findings of fact and conclusions of law not only are not required by Rule 12(e) of the Federal Rules of Criminal Procedure, they in fact are antithetical to that Rule.

2. The panel opinion incorrectly states that defendant was charged with possession with intent to distribute cocaine, rather than cocaine base. Although that error doubtless was inadvertent, and there is one later reference to an object having an appearance "similar to crack cocaine," the difference is significant for a number of reasons. "Cocaine" refers to cocaine hydrochloride, which is water-soluble and is ingested by inhaling or injecting. "Cocaine base" is generally known as crack, and is ingested by smoking. Crack is significantly more addictive than the powdered cocaine from which it is made; it is crack which is so devastating our inner cities, and, while affected by the quantities involved, generally speaking the penalties for crack offenses are considerably more severe than those for offenses involving cocaine. Also, the fact that the substance involved here was crack, rather than cocaine powder, has additional significance, in that its small ziplock bag packaging for street distribution is so readily recognizable.

Some 25 grams of cocaine base or crack were seized from defendant's person, with a street value of about $2,500. At the time of his arrest, he was on parole for a PCP violation. His guideline sentencing range, predicated largely on the quantity of the cocaine base (crack) and his three prior drug convictions, was 110–137 months. The Court sentenced him to 120 months, followed by four years of supervised release.

3. The Court of Appeals began its recitation of the facts by saying: "As best as we can make out from [the officers'] testimony...." This Court does not believe that the appellate panel would have had any difficulty in understanding the evidence.

asked to speak to him. Defendant responded, "You've got the wrong guy. I'm just walking through the area." Sergeant Wasserman then explained that Officer Marsh, who had meanwhile stopped another suspect and was by the van, needed to speak to defendant. On the way back to the van, defendant repeatedly stated, "You can check me. I've got nothing. I'm just walking through the area. I think you've got the wrong guy. . . . Really, if you check me, I wasn't doing anything at all I was just walking through the area I think you've got the wrong guy." (Tr. at 31.) Sergeant Wasserman explained that defendant met Officer Marsh's description and that he would be "free to go" if Officer Marsh said he was the wrong person.

Sergeant Wasserman was a six-year veteran of the U.S. Park Police, and he had participated in approximately 1,500 narcotics-related arrests during a two-and-a-half-year stint in the narcotics vice unit. As he walked defendant to the van, he noticed the corner of a ziplock bag protruding from defendant's left front pocket. He recognized the ziplock, based on his experience, as the type of bag frequently used in the distribution of drugs. Then, after Officer Marsh confirmed that defendant was, in fact, the correct person, Sergeant Wasserman decided to act on defendant's suggestion to "check [him] out." First, the Sergeant removed the ziplock bag from defendant's pocket, revealing a large rock of crack cocaine. Defendant claimed that the rock was not real cocaine, but a field test indicated that it was. Sergeant Wasserman then placed defendant under arrest.

A further search of defendant produced another ziplock bag containing numerous empty smaller ziplock bags which Sergeant Wasserman recognized as being consistent with packaging for the distribution of crack cocaine. A beeper also was recovered by Investigator Dowd, who assisted in searching defendant after his arrest.

### Conclusions of Law

#### A. *Sergeant Wasserman Had Articulable Suspicion To Detain Defendant for the Purposes of a Terry Stop*

It is well established that "a reasonable investigative stop does not offend the Fourth Amendment." *United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 1880–81, 64 L.Ed.2d 497 (1980) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The legality of an investigative stop turns on whether the officer's response to the situation was reasonable in light of the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981).[4] While "[the] Fourth Amendment requires 'some minimal level of objective justification' for making the [*Terry* ] stop", "[t]hat level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). *See also Alabama v. White,* 496 U.S. 325, 329–30, 110 S.Ct. 2412, 2415–16, 110 L.Ed.2d 301 (1990) (emphasizing that a lesser showing is required to show reasonable suspicion than to show probable cause). " '[I]nnocent behavior will frequently provide the basis for a showing of probable cause,' " and this "principle applies equally well to the reasonable suspicion inquiry." *Sokolow,* 490 U.S. at 10, 109 S.Ct. at 1587 (quoting *Illinois v. Gates,* 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2334–35 n. 13, 76 L.Ed.2d 527 (1983)).

Considering the totality of the circumstances, there can be no serious doubt that Sergeant Wasserman justifiably detained defendant for the limited purpose of escorting him to the van to confirm Officer Marsh's identification and for further investigation. At that point in time, Officer Marsh had observed defendant hand what appeared to be crack cocaine to another individual in exchange for what appeared to be United States currency, had described what he had seen to Sergeant Wasserman, and had pointed defendant out to Sergeant Wasserman.

---

**4.** The officer's suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion," and the facts must be "judged against an objective standard: Would the facts available to the officer at the moment 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880.

The fact that Sergeant Wasserman did not personally witness defendant's involvement in the drug transaction is of no moment. *See Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all.") (citations omitted); *Smith v. United States*, 358 F.2d 833, 835 (D.C.Cir.1966), *cert. denied*, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). These facts were sufficient to "warrant a man of reasonable caution in the belief" that "criminal activity was afoot." *Terry*, 392 U.S. at 21–22, 30, 88 S.Ct. at 1880, 1884. *See United States v. White*, 655 F.2d 1302, 1303–04 (D.C.Cir.1981) (experienced officers have probable cause to make an arrest where they observe conduct similar to a narcotics transaction in a high narcotics area). Moreover, the fact that there may have been an innocent explanation for defendant's actions does not mean the police cannot inquire further. *See People v. Wheeler*, 43 Cal.App.3d 898, 118 Cal.Rptr. 205 (1974) ("The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal. . . .").

Furthermore, Sergeant Wasserman also could consider the fact that defendant, who was talking to someone, immediately turned around and walked away when he approached him. *See Peters v. New York*, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968), decided with *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917

(1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."); *cf. California v. Hodari D.*, —— U.S. ——, —— n. 1, 111 S.Ct. 1547, 1549 n. 1, 113 L.Ed.2d 690 (1991) ("That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense.") (citing Proverbs 28:1—"The wicked flee when no man pursueth.") In sum, Sergeant Wasserman had more than the "minimal level of objective justification" necessary to stop defendant. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585.[5]

### B. Once Sergeant Wasserman Observed the Ziplock Bag and Officer Marsh Positively Identified the Defendant, Articulable Suspicion Ripened into Probable Cause

The law is well-settled that "[a] warrantless arrest in a public place is permissible only if the arresting officer has probable cause." *United States v. Lucas*, 778 F.2d 885, 887 (D.C.Cir.1985) (citing *Henry v. United States*, 361 U.S. 98, 100–02, 80 S.Ct. 168, 169–71, 4 L.Ed.2d 134 (1959)). The determination of whether probable cause exists in a given situation is based upon consideration of the totality of the circumstances and whether "a reasonably prudent person applying 'common sense conclusions about human behavior' would believe that a crime has been committed or is being committed."

---

5.  Defendant's contention (on appeal) that his seizure at that point constituted an arrest has no merit. In *United States v. White*, 648 F.2d 29, 34 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235 (1981), the court listed several factors that should be considered in determining whether an officer's conduct constituted an investigatory stop or rose to the level of an arrest. These factors included the *intent of the officers, the length of the stop, the impression conveyed, the questions, if any, asked, and the extent of the search.* In the instant case, consideration of all these factors reveals that Sergeant Wasserman's conduct prior

to the discovery of the crack cocaine was consistent with that of a *Terry* stop and not an arrest. The purpose of the stop was to determine whether he had detained the correct person. Sergeant Wasserman did nothing to suggest that defendant was under arrest as he walked defendant to the van, nor was there reason for defendant to believe that he was under arrest. In fact, Sergeant Wasserman explicitly told defendant he would be free to go *if he were not positively identified* by Officer Marsh. Defendant was not searched or handcuffed; he was merely detained for the short period of time it took Sergeant Wasserman to walk defendant to the van.

*United States v. Lucas,* 778 F.2d at 887 (footnote omitted).

The circumstances should be viewed from the perspective of a reasonably prudent police officer in light of his training and experience. *See id.* (citing *Illinois v. Gates,* 462 U.S. at 230, 103 S.Ct. at 2328, and *Carroll v. United States,* 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)); *accord United States v. Green,* 670 F.2d 1148, 1152 (D.C.Cir.1981) (citations omitted); *Jackson v. United States,* 302 F.2d 194, 196 (D.C.Cir. 1962) (officer guided by whole of his experience). For example, the Court of Appeals previously has reasoned that "[a]n officer experienced in the narcotics traffic may find probable cause in the smell of drugs and the appearance of paraphernalia which to the lay eye is without significance." *Bell v. United States,* 254 F.2d 82, 86 (D.C.Cir.), *cert. denied,* 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958). Moreover, in *White,* 655 F.2d at 1303–04, the court held that probable cause exists where officers, who have previously demonstrated their ability to recognize narcotics transactions, observe conduct similar to a narcotics transaction in a high narcotics area.

Here, articulable suspicion ripened into probable cause to arrest defendant when Sergeant Wasserman saw the ziplock bag protruding from defendant's front pocket and when Officer Marsh confirmed that defendant was the person involved in the transfer of the small object to the unidentified person for currency in a high narcotics area. Again, it is important to note Wasserman's experience: in his six-and-a-half years on the force, he had participated in approximately 1,500 narcotics-related arrests and had frequently seen ziplock bags used in the distribution of drugs.

Based upon both the information he received from Officer Marsh, and his own years of training and experience, Sergeant Wasserman reasonably was able to deduce that defendant was carrying drugs in his pocket when Wasserman saw the ziplock bag protruding therefrom. Under the totality of these circumstances, there was probable cause for the defendant's arrest. The co-

caine base therefore was properly recovered in a search of defendant's pocket (the one from which the ziplock bag was protruding) incident to arrest. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

C.  *In the Alternative, the Search of Defendant Can Be Justified as the Product of Valid Consent*

Although the Court of Appeals cryptically notes that the "government never raised the issue of consent" the first time around, as though that somehow could have dispositive significance, the court opined that this Court may nevertheless have ruled on this basis. Accordingly, while Parts A and B above set forth in detail the Court's principal reasoning at the time of the hearing, the record supported an alternative basis for the constitutionality of the recovery of the drugs, *i.e.,* defendant consented to the officer's search.

As noted above, when Sergeant Wasserman was walking with the defendant back to the police van, defendant repeatedly stated, "You can check me. I've got nothing. I'm just walking through the area. I think you've got the wrong guy.... Really, if you check me, I wasn't doing anything at all. I was just walking through the area I think you've got the wrong guy." To determine whether this consent was voluntary within the meaning of the Fourth Amendment, the Court again should consider the "totality of all the circumstances," contemplating such factors as the defendant's age, education, intelligence, lack of advice concerning his constitutional rights, the prolonged nature of the questioning, and the use of (any) physical punishment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Battista,* 876 F.2d 201, 207 (D.C.Cir.1989); *United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir. 1989). No single factor is dispositive. *United States v. Lewis,* 921 F.2d 1294, 1300–01 (D.C.Cir.1990).

In the instant case, Sergeant Wasserman did not even ask for permission to search; rather, defendant repeatedly invited the officer to search him, saying, "You can check me. I've got nothing." *See United States v.*

**12**

*Cooper,* 499 F.2d 1060 (D.C.Cir.1974) ("absolutely no coercion" found where defendant himself "invited" police to search his wardrobe). Moreover, defendant's (appellate) claim that the encounter with Sergeant Wasserman was fundamentally coercive and that his consent was constitutionally defective does not withstand scrutiny. Here, there was no " 'aggressive questioning, intimidating actions, or prolonged police presence' "; [defendant] was not forcibly detained or physically abused." *Lloyd,* 868 F.2d at 451. In addition, defendant's (appellate) claim that he is a "young man with limited education, and intelligence" (Brief for Appellant at 18), does not state his age or note any particular mental defects. (In fact, defendant is 29, with three prior adult convictions.)

Finally, defendant's (appellate) claim that he was unaware of his right to refuse to consent (Brief for Appellant at 18), is similarly misplaced since he was never asked for permission to be searched but instead initiated the suggestion that the police search him. Moreover, an officer is not required to inform a person that he has the right to refuse consent. *E.g., United States v. Smith,* 901 F.2d 1116, 1118 (D.C.Cir.) (quoting *United States v. Joseph,* 892 F.2d 118, 122 (D.C.Cir.1989)), *cert. denied,* 498 U.S. 863, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990). In short, defendant, by repeatedly inviting the police to search him, consented to the search of his person that led to the discovery of contraband.

For all of the foregoing reasons, defendant's motion to suppress was denied orally at the conclusion of the motion hearing on October 2, 1990.