**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**UNITED STATES CUSTOMS SERVICE, Defendant.**

Civ. A. No. 92–2761.

United States District Court, District of Columbia.

July 1, 1993.

David F. Klein, National Treasury Employees Union, Gen. Counsel, Washington, DC, for plaintiffs.

Peter Baker Robbins, Mary Ellen Goetten, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

In December, 1992, the defendant United States Customs Service ("Customs") announced its intention to implement a new drug-screening program under which an expanded class of Customs employees with access to certain computer files will be required to submit to random periodic urinalyses to detect the presence of controlled substances. *See generally* Department of the Treasury, U.S. Customs Service, Draft Directive re: Drug–Free Federal Workplace Program (1992) [hereinafter "Draft Directive"]. The plaintiff National Treasury Employees Union ("NTEU"), the collective bargaining representative for some 12,000 Customs employees, contends that the proposed testing plan violates the Fourth Amendment's proscription of unreasonable searches and prays that the new testing program be permanently enjoined.[1] The case is presently before the Court on cross-motions for summary judgment.

### I.

Supreme Court jurisprudence on the subject of the interrelationship between the Fourth Amendment and mandatory drug-screening of federal employees by urinalysis begins with Customs' own first drug-testing program, dating from 1986, which reached the Supreme Court in late 1988. In March, 1989, the Supreme Court decided *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), holding for the first time that mandatory drug testing, when conducted by or at the direction of the government, is a "search" for Fourth Amendment purposes and, thus, is constitutionally permissible only to the extent it is "reasonable." *Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390 (citing *Skinner v. Railway Labor Executives' Assn.,* 489 U.S.

---

1. Customs has voluntarily refrained from implementing the program pending a decision in this case.

*602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (decided the same day)).[2]*

■ The Supreme Court also held in *Von Raab,* however, that, in other than direct law enforcement situations, a constitutionally legitimate search need not always be supported by a warrant or be based on some level of individualized suspicion. *Id.* at 665–66, 109 S.Ct. at 1390–91. "Reasonableness" in the drug-testing context is determined by balancing the government's interests in deterring and detecting drug use by its employees against the magnitude of the invasion of the employees' privacy interest occasioned by the testing. *Id.* at 666–72, 109 S.Ct. at 1391–94. Implicitly rejecting a generalized interest in having law-abiding employees unimpaired by drug use as sufficient justification for its drug-testing, the Supreme Court focused on the nature of a particular employee's position in relation to the specific interest the Customs Service perceived as vulnerable in consequence of the employee's possible drug use. Customs had identified certain positions within the agency as "testing designated positions" ("TDPs"). Any position involving direct drug interdiction, carriage of a firearm, or access to classified information, was designated as a TDP. All Customs employees in a TDP, or those selected for placement in a TDP, were required to participate in mandatory drug-screening by urinalysis.

The Supreme Court upheld the 1986 Customs plan insofar as it required testing of applicants for promotion to positions as front-line interdiction agents and employees required to carry firearms. It remanded the case to the lower courts for clarification as to the necessity of drug testing for individuals whose only exploitable perquisite of employment was their access to classified or confidential information. In so doing, however,

the *Von Raab* court acknowledged that protecting the integrity of "truly sensitive" information is a sufficiently compelling interest to justify drug testing. *Id.* at 677, 109 S.Ct. at 1397.[3]

In the spate of post-*Von Raab* cases that followed to challenge drug testing as practiced elsewhere in the federal government, at least one gave the D.C. Circuit occasion to reflect upon when confidential material had acquired such "truly sensitive" stature as to justify random drug testing of those privy to it. In *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), the court of appeals upheld a Department of Justice ("DOJ") drug testing program insofar as it required random testing of all current departmental employees with top-secret security clearance, holding that "truly sensitive" certainly includes top-secret national security information. *Id.* at 491–92; *see also American Fed'n of Gov't Employees v. Skinner,* 885 F.2d 884, 892–93 (D.C.Cir.1989), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990). The *Harmon* court also cautioned, however, that "whatever the precise contours of 'truly sensitive' information ... the term cannot include *all* information which is confidential or closed to the public eye," *Harmon,* 878 F.2d at 492, and went on to hold that DOJ employees could *not* be subject to drug testing merely because they had prosecutorial duties or were exposed to "grand jury information." *Id.* at 492–93.

## II.

Customs' new plan at issue here adds still more categories to the list of its TDPs: individual Customs employees will henceforth be subject to random drug testing if they have access to certain database information main-

---

**2.** In *Skinner,* the Supreme Court considered mandatory drug testing of private railroad employees pursuant to federal regulation, employing a similar constitutional analysis.

In *Von Raab,* as here, NTEU represented civilian federal employees of the U.S. Customs Service.

**3.** On remand, Customs supplemented the record with evidence to show that its plan would be limited to individuals with access to top-secret national security information, and upon this clar-

ification the district court upheld the plan. *National Treasury Employees Union v. Hallett,* 756 F.Supp. 947 (E.D.La.1991).

In the meantime, in 1989, Customs had broadened the scope of its testing program, expanding its list of TDPs to include several new categories of employees with "safety sensitive" positions and authorizing random, unannounced testing. The 1989 plan, too, withstood constitutional challenge. *See National Treasury Employees Union v. Hallett,* 776 F.Supp. 680 (E.D.N.Y.1991).

tained and stored in Customs' computers. Upon implementation of the 1992 plan, an estimated 2700 additional Customs employees will now be subject to random testing for the first time.

Under the new plan, Customs employees who have access to Customs' "TECS II" computerized database, and certain files in its "ACS" database, will be subject to random testing. Draft Directive, *supra,* at ¶ 6, § H. The TECS II system contains law enforcement information for use by a number of government agencies, including Customs and the FBI, and the State Department. The TECS II system is divided into four levels, and depending on his or her position and authorization, an employee may be able to access some or all of these levels. Level 1 is available to all TECS II users and contains National Crime Information Center intelligence, identifying persons and objects believed to be connected with criminal activity. Level 2 contains Customs-specific records relating to arrests and investigations. Level 3, access to which is highly restricted, contains material relating to ongoing Customs investigations. And Level 4, which is yet more highly restricted, contains information that Customs considers most sensitive (but also includes the "grand jury information" the *Harmon* court thought to be of insufficient consequence). Customs employees with access to any of the TECS II levels are to be subject to random testing under the new plan.

ACS is a similar database containing records relating to commercial traffic into and out of the United States. ACS is divided into thirteen "modules," which are grouped by subject matter. Depending on his or her duties, a Customs employee may have access to one or more of these modules. Under the new plan, a Customs employee will be subject to random drug testing if he or she has access to the "fines, penalties and forfeitures" module ("FPM module") or to the "cargo selectivity criteria" module ("CSC module"). The FPM module contains records of all Customs seizures, including the contraband seized and the particulars of the case. The CSC module contains a checklist of characteristics that Customs has identified as indicative of illegal smuggling activities.

Customs argues, as expected, that random testing of employees with access to these files is necessary to maintain the confidentiality of the information they contain. It contends that the lucrative nature of the drug trade creates a high risk of corruption of employees susceptible to temptation or blackmail (as drug users are likely to be) who have access to TECS II or ACS information, and, accordingly, an increased risk of disclosure of material that those involved in illegal drug trafficking or smuggling would find exceptionally valuable. Drug testing, Customs asserts, at least offers some protections against its compromise, if it will not altogether prevent it.

The plaintiff contends, as it has in other such cases, that any governmental interest in testing a multitude of low-level Customs employees with a low corruptibility quotient is insufficient to justify the indignity of warrantless, random drug testing mandated without any individualized suspicion of drug use.

### III.

■ It is against this backdrop that this Court is asked to determine whether the material in the TECS II and ACS databases is sufficiently "truly sensitive" to justify Customs' proposed 1992 drug-testing plan. Customs' description of the perils that may befall the nation from disclosure of this material may be somewhat exaggerated, but the Court is nevertheless persuaded that acquisition of this information by certain criminally inclined elements does have genuine potential to cause serious disruptions of law enforcement activities. Indeed, in this Court's estimation, a compromise of the material in either of the Customs' databases has a more realistic likelihood of doing more discernible damage to the national interest than disclosure of some of the other material now lawfully withheld from public scrutiny by various federal agencies' classification systems. Because of this potential, the Court must conclude that the material at issue here falls somewhere on the sensitivity spectrum between the "grand jury information" deemed

not "truly sensitive" in *Harmon* and the "top secret information" which has consistently been held to be "truly sensitive" by the federal courts, including the D.C. Circuit. *See Harmon,* 878 F.2d at 491–92; *American Fed'n of Gov't Employees,* 885 F.2d at 892–93.

The court of appeals' opinion in *Harmon,* read in conjunction with *Von Raab* and *Skinner,* appears to indicate that for any given testing plan in which the integrity of confidential information is the government's concern, there is some critical mass of "sensitivity" that, once reached, will justify random testing. But even with the court of appeals' guidance in *Harmon,* this Court finds the task of ascertaining exactly where on the spectrum the material in Customs' TECS II and ACS databases falls to be virtually impossible. Treated as an issue of fact, it largely calls for the Court to indulge in imaginative speculation rather than historical fact-finding. The question the issue poses is: How can an astute law-breaker make use of the information in a database to elude detection or evade capture? Unfortunately, those who have successfully done either are not around to provide the actual answer. In any case, the Court is hardly in position to dismiss as mere hyperbole Customs' own assessment of the gravity of the consequences of compromise of this material, as the plaintiff would have it do.

### IV.

■ In *Willner v. Thornburgh,* 928 F.2d 1185 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991), in which the court of appeals upheld another Department of Justice program of drug screening of initial applicants for employment, the court said: "The protections of the Fourth Amendment are graduated in proportion to the privacy interests affected. Decreasing levels of intrusiveness require decreasing levels of justification." *Willner,* 928 F.2d at 1188. In other words, the smaller or less reasonable the "privacy expectations" of the testing subject, and the less "intrusive" the testing procedure, the lighter the government's burden of demonstrating justification for the testing it proposes to do.

Therefore, having concluded that unauthorized disclosure of material on Customs' TECS II and ACS databases has the potential to cause some significant damage to law enforcement efforts generally, and that the prevention of such disclosure is thus a legitimate governmental interest rendering some degree of encroachment upon Customs employees' privacy expectations permissible to accomplish it, rather than engaging in an extended "sensitivity" analysis, the Court will approach the issue *via* the "privacy expectation" and the "intrusiveness" elements presented by random testing in general, and Customs' plan in particular, to determine whether the testing is justified in the instant case.

■ It is not, of course, permitted to this Court to revisit the issue of whether drug testing by urinalysis intrudes upon reasonable expectations of privacy at all. That was answered in the affirmative by *Von Raab.* Nevertheless, this Court believes that the plaintiff's assumptions of intrusiveness of the testing, no less so than defendant's of the sensitivity of its data, have been vastly overstated. This Court concludes, therefore, that the privacy intrusions it perceives to be imposed by the Customs plan are not so onerous as to prohibit the government from insisting that its TDP employees submit to them as a condition of continued employment.

■ There are two distinct features of drug testing said to work an invasion of a subject's reasonable expectations of privacy. First is the intrusion occasioned by compelling the subject to produce a urine specimen, and, accordingly, engage in an otherwise private and personal act. *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 175–76 (5th Cir.1987), *aff'd in pertinent part,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (cited with approval in *Skinner,* 489 U.S. at 617, 109 S.Ct. at 1413). Second is the testing of the sample itself to unlock the chemical secrets of the subject contained therein. *Id.* at 175.

At oral argument, the plaintiff's counsel proffered a catalogue of the insults drug testing inflicts upon the subjects' privacy to

demonstrate just how intrusive the process is. Foremost among them, the plaintiff contends, is the "apprehension" it engenders, the apprehension being that a subject will test positive for drug metabolites, and be sanctioned accordingly, even if he or she has *not* illegally used drugs. (Conspicuously omitted is any mention of an "apprehension" that *illegal* drug use might be discovered.)

But the drug testing procedures employed by Customs involve many safeguards to assure that disputed reports of drug use will not survive without verification. These include elaborate chain-of-custody requirements, mandatory confirmation testing of positive samples by independent laboratories, and a personal review of all positive results by a licensed physician reviewing officer, including exploration of the possibility of innocent alternative medical explanations. Draft Directive, *supra* at §§ 10–13, 18; Mandatory Guidelines, 53 Fed.Reg. at 11,982–86.

Next on plaintiff's list of specific injuries done to the privacy of the test subjects is that those who test positive because they are legally receiving prescription medication for various ailments will be forced to disclose private medical facts in order to convince the testing authority that the result does not warrant discipline. The fact that one is receiving medication by prescription is a matter that an employee might, perhaps, prefer to keep to himself, but it is by no means uncommon for an employer to become legitimately aware of a previously unknown medical condition of an employee in other contexts—in the course of approving or excusing absences from work, for example, or making or arranging for the payment of benefits, or altering working conditions to accommodate an illness. In short, although the knowledge that an employee is taking medication may be deserving of respect and treated by the employer with discretion, it does not rank particularly high on the scale of inviolability of those matters that may be kept with impunity from an inquisitive employer.

Finally, it appears that Customs' collection and testing procedures do not confront the subjects with experiences so repugnant to the sensibilities of the average citizen (or of the reasonable Customs employee) as to give rise to outrage at the intrusiveness of it all. Customs' program is standard, routine, and appears to the Court to be designed to minimize any associated indignities to the greatest extent practicable without substantial sacrifice of reliability. *See generally* Department of Health and Human Services, Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed.Reg. 11,970, 11,-979 (Apr. 11, 1988). The testing subject is, for example, permitted to void the sample in private; the act of micturition is unobserved unless the official in charge "ha[s] reason to believe that a particular individual may alter or substitute the specimen to be provided." *Id.* at 11,980; *see id.* at 11,980–92.[4]

These procedures should precipitate a level of embarrassment no more severe than that occasioned by a routine visit to a physician's office, and far less so than a trip to a crowded public restroom. Other than by abandoning drug screening altogether, the Court cannot envision a less inhibiting means by which the Customs Service could effectively detect and/or deter drug use by those of its employees in a position to compromise the TECS II and ACS database information.

Urine is, after all, simply a bodily waste product. Once excreted, it is universally discarded by everyone into a receptacle for eventual disposal by public sanitation authorities. It is doubtful that most Americans know or care what happens to their urine after it is voided and flushed from the toilet, and in all probability care far less so than they care about what might be learned about them from examining their household refuse. *See California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (no expectation of privacy in abandoned rubbish left for collection outside the home).[5]

---

**4.** Samples are tested only for drug metabolites, and the agency is not authorized to seek to discover any other information about a subject. *Id.* at 11,980. Routine clinical urinalyses, by comparison, quantify the amounts of such substances as urea, uric acid, nitrogen, ammonia chlorides, phosphate, sulfur, creatinine, and ketosteroids found in the specimen.

**5.** The Court acknowledges, however, that other courts have, implicitly at least, rejected an analogy to abandoned garbage. *See, e.g., Von Raab,*

A complete chemical analysis of urine reveals relatively little of a personal nature about the subject, the composition of which is common to everyone and is certainly less distinctive to the individual than is, for example, a fingerprint or a photograph, items often required as conditions of employment without ever, to this Court's knowledge, provoking a Fourth Amendment objection. Drug-screen urinalyses such as those employed in Customs' program reveal even less; they test *only* for the presence of controlled substances—opiates; phencyclidine; amphetamines; and marijuana and cocaine metabolites—which should not ordinarily be found in anyone's urine without medical justification. Consequently, an accurate positive result reveals nothing about the subject other than that he or she is under medical·treatment or has broken the law. Whether the latter fact is entitled to privacy protection is an issue not raised by this case.

For the foregoing reasons, it is, this 1st day of July, 1993,

ORDERED, that the defendant's motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied; and it is,

FURTHER ORDERED, that judgment is entered in favor of defendant United States Customs Service and against plaintiff National Treasury Employees Union; and it is

FURTHER ORDERED, that the plaintiff's motions for temporary restraining order and preliminary injunction are denied as moot; and it is

FURTHER ORDERED, that the plaintiff's complaint is dismissed with prejudice.

816 F.2d at 175–76; *National Treasury Employees Union v. Von Raab,* 649 F.Supp. 380, 387 (E.D.La.1986), *vacated,* 816 F.2d 170 (5th Cir. 1987), *aff'd in pertinent part,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).