**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**U.S. DEPARTMENT OF TREASURY, et al., Defendants.**

Civ. A. No. 92–1150 (HHG).

United States District Court, District of Columbia.

Dec. 1, 1993.

Barbara Atkin, Sr. Appellate Counsel, Elaine Kaplan, Deputy Gen. Counsel, Nat. Treasury Employees Union, Washington, DC, for plaintiffs.

Edith S. Marshall, Asst. U.S. Atty., Washington, DC, for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

The National Treasury Employees Union (NTEU) and a number of individual plaintiffs seek a preliminary injunction to restrain the U.S. Customs Service from requiring employees in eight different positions to respond to various inquiries on a questionnaire, the claim being that the requirement unconstitutionally violates their right to privacy. NTEU also seeks an injunction to restrain the Customs Service from requiring employees, absent a grant of use immunity, to answer a question concerning their own drug use, the claim being that the requirement violates their Fifth Amendment self-incrimination rights. Pursuant to a stipulation between the parties, Customs is currently refraining from requiring employees in the positions at issue to complete the forms. This stipulation expires this day, December 1, 1993, eight days after a hearing on the motion.

## I

### Background

This case was last before the Court in February 1993. At that time, the Court issued a temporary restraining order while considering the merits of the preliminary injunction request. In the meantime, the Court of Appeals issued its decision in *National Federation of Federal Employees v. Greenberg*, 983 F.2d 286 (D.C.Cir.1993), in which it reversed this Court's temporary decision in favor of the plaintiffs, holding that a facial challenge to the pertinent regulation

1. The Court ruled that the one named plaintiff named in the original complaint, Norman King, had standing to bring challenges to these policies as they applied to him.

2. NTEU represents approximately 2,600 individuals who occupy these types of positions.

could not succeed inasmuch as there were situations where the government was justified in demanding this information from its employees. Said the Court of Appeals, "in a facial challenge, the fact that there may arguably be some invalid applications is beside the point; what matters is whether there are any valid ones." *Id.* at 295.

In light of the Court of Appeals ruling, this Court issued a Memorandum and Order on February 12, 1993, dismissing NTEU's suit for lack of standing, reasoning that the union was unable to meet the representational standing requirement that neither the claim asserted nor the relief pursued required the participation of individual members in the lawsuit. *See International Union, United Auto Workers v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986).[1] This Court also dismissed on the standing basis the claim that the Customs process was arbitrary and capricious under the Administrative Procedures Act.

On June 24, 1993, the NTEU and several individuals filed an amended complaint. This complaint added as plaintiffs several individual employees who hold a variety of non-sensitive positions within the Customs Service, such as import specialist, commodity team aids, auditors, attorneys, computer specialists, and paralegal.[2] These positions primarily concern the Customs' commercial operations, and the employees are not involved in the enforcement of the drug laws, they do not carry weapons,[3] and they do not have access to national security information or perform public safety responsibilities.

## II

### Motion for Preliminary Injunction

The motion for preliminary injunction has two parts.

3. The defendants have indicated in their filings that several employees within the eight positions carry weapons. At the preliminary injunction hearing, the counsel for the defendants stated that two import specialists and two customs aids are currently authorized to carry guns, but this appears to be in connection with collateral duties as customs inspectors or seized property officers.

First. Eleven named plaintiffs who are in "commercial positions" rather than drug interdiction positions,[4] along with the NTEU as the representative of other Customs employees in similar positions, challenge certain questions on Standard Form SF–85P, Customs Form CF 257, and Treasury Department Form TD F 67–32.5 as invasive of their constitutional right to privacy. Plaintiffs argue that because none of these positions has duties that implicate public safety, the government lacks an adequate justification for the questions being asked of these individuals.

Question 18 of SF–85P requires Customs employees to disclose all prior arrests and criminal charges regardless of the ultimate disposition of these charges. In fact, plaintiffs are not challenging that portion of the question that asks about prior convictions. Question 19b requires employees to disclose information about their use of drugs and consumption of alcohol, whether on duty or off. Question 20 inquires into the employees' financial records, including legal actions and loans or financial obligations that are more than 180 days delinquent. And Question 21 requests information about problems resulting from an "emotional or mental condition."

Similarly, CF 257 requires the disclosure of extensive financial information regarding the employee and his family, including details on automobiles owned, personal effects, securities, family inheritances, trust and will administration, and real estate. Finally, TD F 67–32.5 is a release form by which the employee authorizes third parties in advance to provide the Treasury Department with his past medical history, educational records, employment information, credit reports, and other information.

Second. NTEU challenges Question 19 of SF–85P on the ground that it violates the Fifth Amendment privilege against self-incrimination on behalf of employees similarly situated to plaintiff "John Doe."[5] More specifically, subsection (a) of Question 19 asks whether the employee has, in the last five years, "used, possessed, supplied, or manufactured any illegal drugs," and subsection (b) demands information about "problems" *on or off the job* from the use of illegal drugs or alcohol. An affirmative answer to either question obliges the employee to reveal the dates on which illegal substances were used, the types of substances used, the nature of the activity, "any other details relating to" the activity, and "any treatment or counseling received." The government concedes that it has not provided to the Customs employees criminal immunity for any potentially incriminating responses to Question 19.

### III

### *Standing*

The Court's February 12, 1993 Memorandum offered guidance to the plaintiffs on what they would have to do to be entitled to standing:

> The *Greenberg* opinion did not foreclose the possibility that individual Customs employees could successfully challenge these questions on constitutional grounds as they applied to them. It is dubious that the government will be able to establish a sufficient nexus between the information sought in these questions and every single position within the Department of Customs ... In order to subject these questions to constitutional scrutiny, individuals or at least each aggrieved group—*e.g.,* food service workers, clerk-typists, animal trainers—must come into court to challenge them as they apply to their individual circumstances. For that reason the partic-

---

**4.** The eleven named plaintiffs are Mr. Thomas Brady, Mr. Vincent Carl Ilardi, and Mr. Robert Watson, three of 1,200 Import Specialists; Ms. Maureen Marturano, one of 95 Customs Liquidators; Ms. Paula Belfiore, one of 70 Commodity Team Aids; Ms. Diana Omodini, one of 700 Customs Aids; Mr. Marcus Sircus and Ms. Robin Bishop, two of 150 Auditors; Mr. Greg Riley, one of 109 Paralegals; Mr. Norman King, one of 90 Attorney–Advisors and a named plaintiff in the original complaint; and Mr. Charles Hottel, Jr., one of 170 Computer Specialists. The amended complaint concedes that the numbers of employees within each positions group is approximate.

**5.** John Doe apparently was a recent user of illegal drugs, and if he answered Question 19 truthfully, he would have to respond affirmatively to the use of drugs.

ipation of individual union members is required and the NTEU lacks standing. Memorandum at 12.

NTEU has attempted to tailor its complaint to that Memorandum language so that its complaint no longer represents a facial challenge to the regulation but one with specific "aggrieved groups" represented by the union, along with at least one named plaintiff who is an actual employee. In short, NTEU claims a status for more insular groups than it had "represented" previously.

In *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court held that the test for representational standing requires:

(1) the members of the association would have standing individually;

(2) the interests pursued through the litigation are germane to the association's purpose; and

(3) the claim asserted nor the relief requested does not require the participation of individual members in the lawsuit.

### 1. Standing for the Right to Privacy Claim

█ The Court concludes that NTEU has standing to bring the right to privacy claim. As it stated in its February 12 Memorandum, the first two prongs of the *Hunt* test are clearly met, and there has been no change in that regard.[6] Further, because NTEU has so narrowed the plaintiff class with regard to the right to privacy claim, the Court finds that the third prong is also adequately met in the amended complaint. Instead of its original facial challenge with regard to its right to privacy allegation, NTEU is now bringing suit only on behalf of other bargaining unit employees who hold the same positions as the named individuals, and who, like the named plaintiffs, belong to an employee classification whose members perform duties related to Customs' commercial functions.

In its Opposition, the government argues that the Court's February 12 ruling precludes NTEU from ever meeting the third prong of the representational standing test. Opposition at 15–16. However, this broad claim simply cannot be a proper interpretation—unions, NTEU in fact, have been granted standing in a representational capacity in many different contexts. *See, e.g., NTEU v. Von Raab*, 489 U.S. 656, 663, 109 S.Ct. 1384, 1389, 103 L.Ed.2d 685 (1989) (remanded for other reasons); *NTEU v. Hallett*, 776 F.Supp. 680 (E.D.N.Y.1991).

The government also contends that its "interest in obtaining information cannot be assessed generically but must be done on a case-by-case basis taking into account individual circumstances and related variations in duties and assignments." Opposition at 22. However, this obvious effort to make it impossible ever to mount an effective legal challenge to apparently unconstitutional governmental action is not well taken. As explained in more detail in Section IV–1, *infra*, the government's contention is at odds with the Court's previous finding that with a more narrowly tailored plaintiff class, "the purported government need for the information revealed by these questions would presumably be the same for each employee in one type of position." February 12 Memorandum at 12. That finding still holds true. The Court concludes that plaintiffs' request for injunctive relief does not require individualized proof and can be "properly resolved in a group context." *See Hunt, supra*, 432 U.S. at 344, 97 S.Ct. at 2442.

### 2. Standing for Fifth Amendment Claim

█ NTEU also has standing to bring the Fifth Amendment claim. NTEU brings such a claim against the use of Question 19 on behalf of all Customs employees in the bargaining unit who are like "John Doe," that is, employees who are subject to reinvestigation and who have used illegal drugs in the preceding five years. It is important to note that the union brings this challenge only on

---

**6.** In that Memorandum, the Court found that the first prong was met because the Customs employees are required to answer these questions as a condition of their employment, and the second prong was met because the relief sought is clearly germane to the union's general mission of protecting the interest of its members. *See NTEU v. U.S. Treasury Dept.*, C.A. No. 92–1150, Memorandum and Order, February 12, 1993, at 9.

behalf of those who would incriminate themselves if they answered Question 19 truthfully. To be sure, it may be that an appropriate remedial order could not be limited to such employees, but that is a subject to be explored at the time the merits are before the Court and, possibly, a remedy is to be fashioned.

The union seeks representational standing only on behalf of those who would incriminate themselves if they answered Question 19 truthfully. Given this narrow plaintiff class, it is clear that plaintiffs' request for injunctive relief no longer requires individualized proof and, under *Hunt, supra,* can be properly resolved in a group context. The group of persons, no matter how small or large that group may be, who would incriminate themselves by truthfully answering Question 19 present a claim that can, and given the circumstances should, be addressed in a group context through a representational medium. As the Supreme Court has said,

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

*Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975). This certainly disposes of the standing question.

The government's argument to the contrary confuses the relief sought with the violation alleged. Indeed, that argument is at odds with the standing decision made in *National Treasury Employees Union v. Von Raab,* 649 F.Supp. 380 (E.D.La.1986), which was not upset by the Supreme Court, *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 663, 109 S.Ct. 1384, 1389, 103 L.Ed.2d 685 (1989) (remanded for other reasons).

For these reasons, the Court finds that NTEU has met the third prong of the representation standing test in addition to meeting the other two prongs, and thus has standing for both the right to privacy claim and the Fifth Amendment claim. The government does not contest the standing of the named individual plaintiffs, and the Court therefore concludes that they have standing as well.

IV

*Preliminary Injunction Factors*

In deciding whether a preliminary injunction is appropriate, the Court must weigh four factors: (1) plaintiffs' likelihood of success on the merits; (2) the threat that plaintiffs will suffer irreparable harm if an injunction is denied; (3) the likelihood that defendants will suffer substantial harm if an injunction is granted; and (4) the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977).

1. *Plaintiffs' Likelihood of Prevailing on the Merits*

■ The Court concludes that the plaintiffs have a strong likelihood of prevailing on the merits. As is clear from the Court of Appeals decision in *Greenberg,* and other relevant cases, the questions on the Customs questionnaire are not *per se* unconstitutional. *See NFFE v. Greenberg, supra,* 983 F.2d at 294; their legality turns on the Customs Service's asserted need for the information.

■ The Constitution broadly protects against forced disclosure of private information. *See Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 875–877, 51 L.Ed.2d 64 (1977). This right to confidentiality is not absolute, however, and the government may infringe on an individual's constitutional rights in this respect if it is able to demonstrate that its interest is compelling. *O'Connor v. Ortega,* 480 U.S. 709, 719, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987). In deciding the parameters of Fourth Amendment searches in the workplace, for example, the Supreme Court held that the government only has a valid interest where a "nexus to work responsibilities is shown." *Id.* at 719–20, 107 S.Ct. at 1498–99. A similar nexus is

required when the government attempts to infringe on an individual's right to privacy. *See Doe v. Hampton,* 566 F.2d 265, 272 n. 20 (D.C.Cir.1977).

■ Given the type of commercial work that is performed by the plaintiffs named in the amended complaint, the government has been hard pressed to demonstrate that it has a compelling interest in collecting the type of information demanded in the questionnaire. As this Court's February 12 Memorandum suggests, it is "not sufficient for the agency to simply rely on Customs' law enforcement mission and the fact that Customs employees have 'access' to confidential information and narcotics." Memorandum at 12 (referring to *Harmon v. Thornburgh,* 878 F.2d 484, 491–92 (D.C.Cir.1989)).

The government has attempted to provide more detail through numerous sworn declarations which note that across the eight employee positions at issue and within those positions, some variations exist as to the employees' involvement in, and capacity to impact on, what are said to be sensitive matters. Opposition at 17. But this "divide-and-conquer" approach is weak and unpersuasive.

For example, the government notes that a few employees within the groups sought to be represented by NTEU have been issued firearms.[7] As another example, the government focuses on the fact that some employees in each of the eight employee groups sought to be represented by NTEU have access to sensitive computer systems.[8] Such examples, the government argues, are enough for a judicial finding that the government's interest is sufficiently weighty to outbalance most, if not all, the privacy interests involved in the case, particularly because the government asserts that the information collected is kept confidential.[9]

In other words, the government is attempting to justify its intrusions into very personal matters of literally thousands of non-sensitive employees based on the fact that four carry guns and some have access to computer information.[10] The government has also provided declarations by the named plaintiffs' supervisors, who speculate about the kinds of misconduct each of the employees could commit, assuming they were so inclined, and the damage that might result, assuming they were not caught.

■ This analysis reduces these employees to unknown entities, which they are not. These employees are not job applicants; they are current, long-term employees of the Customs Service who have been subject to supervision for at least five years, and many of them for fifteen years or more. With this seniority, comes both a heightened expectation of privacy, *cf. Willner v. Thornburgh,*

---

7. As noted, at the preliminary injunction hearing, government counsel stated that four specialists out of thousands (*see* note 2, *supra*) are currently authorized to carry guns because they also have collateral duties as customs inspectors or seized property officers.

8. The government relies on a recent opinion by Judge Jackson of this Court which concluded that the unauthorized disclosure of material from certain data bases have sufficient potential to cause some significant damage to law enforcement efforts generally to make random drug testing through urine samples of Customs employees with access to those data bases constitutionally permissible. *See National Treasury Employees Union, et al., v. United States Custom Service,* 829 F.Supp. 408 (D.D.C.1993). This decision is currently on appeal.

Judge Jackson's case is clearly distinguishable. As he stated in his conclusion, "an accurate positive result [of a urine analysis] reveals nothing about the subject other than that he or she is under medical treatment or has broken the law.

Whether the latter fact is entitled to privacy protection is an issue not raise by this case." *Id.* at 414. Here, the revelation that someone *has* broken the law is at issue; and much more than just limited treatment is being asked by these questionnaires.

9. The Court notes that at the preliminary injunction hearing, government counsel was unable to name the "limited group" of employees who would have access to the information despite the confidentiality assurances.

10. At the preliminary injunction hearing, the government stated that at least fifty percent of employees had access to the data found in at least one of the two systems. However, counsel conceded that this figure to a large extent included those employees with access to the lowest level of security information found in one of the computer systems at issue. *See also, NTEU v. U.S. Customs Service,* 829 F.Supp. at 410 (describing the two computer systems and the information they contain).

928 F.2d 1185, 1190–92 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991) (distinguishing drug testing of job applicants, who are "strangers" to the agency, from testing of current employees), and a reduced risk of damage to the government.

■ On the other hand, the forced disclosure of personal information prima facie violates the constitutional right to privacy. *See Greenberg, supra*, 983 F.2d at 294. The defendants simply cannot circumvent and render ineffective constitutional protections against government overreaching by insisting that the Court include in a particular category of citizens a minute proportion to which, conceivably, government regulation may not be directly unlawful.

To be sure, the Court of Appeals in *Greenberg* expressed some doubts about the plaintiffs' ability there to prevail on the privacy claims, given that the questionnaire itself "informs employees that their compliance is 'voluntary,' " *Greenberg, supra*, 983 F.2d at 294, stating that the consequences of an employee's refusal to respond was unclear and unknowable based on the record then before it. *Id.*

That aspect of *Greenberg* has now been clarified and amplified. While just as in *Greenberg* both the SF–85P and CF 257 forms state that disclosure of the information is "voluntary," the record now shows that this is simply not true. The memorandum accompanying both forms advise the employees that they are "required" to undergo a periodic reinvestigation and are "required" to answer all questions on the SF–85P, under threat of administrative or disciplinary action. A refusal to furnish the requested information is stated to constitute a violation of Customs' Standards of Conduct and is subject to a range of penalties, from suspension to removal. Motion for Preliminary Injunction at 28–29.

Further, Customs has not been able to cite any instance in which an intentional refusal to furnish information demanded by the forms was not penalized. *Id.* at 29.[11] At a minimum, because completion of an investigation is a predicate for retention of a "sensitive" position, if the withheld information cannot be obtained from other sources, the employee who withholds that information would have to be removed.[12] *Id.* at 29–30. The Court concludes as a matter of fact that the questionnaire information is compelled.

■ The plaintiffs' Fifth Amendment claim is even stronger. In *Garrity v. State of New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the Supreme Court ruled that the Fifth Amendment right of an individual not to be compelled to be a witness against himself applied to public employment situations. As the Court explained, "the option to lose [one's] means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent ... We think [such] statements [a]re infected by the coercion inherent in this scheme [of forced questioning] and cannot be sustained as voluntary under our prior decisions." 385 U.S. at 497–98, 87 S.Ct. at 618–19. The Supreme Court has also ruled that a state cannot discharge an employee who refuses to sign a waiver of immunity. *See Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Uniformed Sanitation Men Association v. Commissioner of Sanitation of the City of New York*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). These principles have been applied to prohibit the government from compelling its employees, under threat of disciplinary action, to provide incriminating information or to waive their privilege against self-incrimination. *See, e.g., Devine*

11. Customs has identified one instance where an employee persisted in refusing to answer a question or complete a form. That employee was disciplined with a five-day suspension even though the refusal to cooperate did not impede the successful resolution of the reinvestigation. *See* Motion for Preliminary Injunction at 29.

12. This is most pertinent to the TD F 67–32.5, the Authority for Release of Information, which requires employees to give defendants access to personal records held by third parties. *Id.* at 18. For example, a signed release is an essential prerequisite to obtain medical and other information. If the employee does not sign the release, the agency cannot obtain that information from another source. *Id.*

*v. Goodstein,* 680 F.2d 243, 246 (D.C.Cir. 1982).

There is no doubt that answers to the "drug use" question, if compelled, would elicit incriminating statements from the plaintiffs NTEU represents. *See National Treasury Employees Union, et al. v. U.S. Department of Treasury, et al.,* Civ. No. A–89–CA–924 (W.D.Tex. August 31, 1992).

 The issue, then, is whether the "drug use" answers are here compelled. The Court first notes it is the perception of the respondent that determines whether the Fifth Amendment privilege properly applies. The privilege protects against "any disclosures that the [respondent or] witness *reasonably believes* could be used *in a criminal prosecution* or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (some emphasis added). Second, the Court notes that its findings of compulsion with regard to the answering of the SF–85P outlined *supra* apply here as well, for Question 19 is one of several questions on that form. Third, the Note to Question 19a warns as follows:

· The information you provide in response to this question will not be provided for use in any criminal proceedings against you, *unless requested by the Department of Justice* in connection with an independent investigation.

In addition, the cover sheet to the form states that information may be disclosed

To the Federal, State, or local agency responsible for investigation, prosecuting, enforcing, or implementing a statute, rule, regulation, or order where there is an indication of a violation or potential violation of civil or criminal law or regulation.

Fourth, if plaintiffs answer Question 19 without a use immunity clause, they may place themselves at risk of being found to have waived their Fifth Amendment rights later because of these qualifications to the "voluntariness" the agency has imposed.

The government attempts to deflect attention from the compulsion issue by asserting that the employee can always plead self-incrimination, and that such an answer could not be used as evidence in a criminal proceeding. However, as government counsel has conceded, the forms do not inform the respondent of this "choice". Additionally, as the Supreme Court has said, the privilege applies not only to disclosures that may be used in a criminal prosecution but also when the disclosures "could lead to other evidence that might be so used." *Devine v. Goodstein,* 680 F.2d 243, 247 (1982). Here, there has been no indication that the act of pleading the Fifth Amendment is not a disclosure in and of itself which could lead to an investigation by the Justice Department. A reasonable person could certainly so conclude.

 By requiring employees to answer incriminating questions, coupled with a warning that the answers could be used against the employee, the government is effectively coercing a waiver of immunity. An employee who is discharged for refusing to answer under these circumstances is, in fact, being discharged for a refusal to waive his constitutional privilege. *Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977).

The Court concludes that Customs is engaged in the Kafkaesque maneuver of attempting to reassure concerned employees falsely that the answers they provide will not be used against them—unless they are used against them.[13] Similarly, government counsel at the hearing on the motion strenuously insisted that the answers would not go to the Department of Justice, only to concede subsequently that there was no impediment to that at all. Employees should not be so misled; nor should courts. A tribunal would plainly be justified in assuming the very real possibility of abuse by government officials when confronted with forms which ask highly personal questions and the answers are demanded through "1984"-like means. The Court finds that the answers to Question 19, the other answers on the SF–85P, as well as the answers to the other two forms, are compelled.

**13.** Not surprisingly in view of the record, at the hearing on the preliminary injunction, the Court found it impossible, despite many attempts, to obtain a clear-cut answer as to the government's position on the disciplinary issue.

### 2. *Threat of Irreparable Harm to Plaintiffs*

■ Turning to the second *Holiday Tours* factor, there is an obvious threat of significant harm if the plaintiffs are forced to disclose this information to the Customs Service. Obviously, once this type of highly personal information is disclosed to the government, the revelation cannot be undone.[14] As plaintiffs correctly point out, "the injury is the threatened loss of constitutional rights. That injury occurs when plaintiffs are forced to choose between revealing constitutionally protected information by submitting completed forms and preserving their rights at the cost of possible further discipline or discharge." Reply to Opposition at 2. The Supreme Court has determined that a threat of discharge for exercising First Amendment rights is sufficient to establish irreparable harm. *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). And in the drug testing context, this Court has issued preliminary injunctions to halt testing imposed on employees under penalty of discharge. *Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989).

Government counsel contend that, if plaintiffs chose not to answer the questions, it would be "unlikely that a plaintiff would face any disciplinary action or job-related repercussions from refusal to answer the challenged inquiries within the time required to achieve final disposition of this case from the Court." Opposition at 6. That assertion is as disingenuous as a number of others discussed herein. Unlikely is not good enough. In addition, the government's argument incorrectly assumes that the injury is a disciplinary action alone, and not also the violation of the constitutional right.

**14.** The Court reaffirms its earlier finding to that effect in its January 29, 1993 Order, which granted the original Temporary Restraining Order.

**15.** Just one day before the December 1, 1993 stipulation regarding non-implementation of the regulation expired, giving neither the Court nor the plaintiff time and opportunity to consider this matter, counsel for the government filed a Motion for Leave to File Supplementary Declaration. This declaration of the Director of Personnel Security indicates that a number of instances of criminal conduct are being investigated among persons in the categories represented by

### 3. *Likelihood of Defendant's Suffering Irreparable Harm*

■ The threat of harm to the government is negligible. In addition to the fact that the Customs Service continues to function without the collection of this information, the government has waited nearly a year to gather these questionnaires, and additional delay should therefore pose little problem. Government counsel claims that any harm to the "integrity and quality of the Customs workforce, or to specific agency operations, may not be apparent or readily discernable at this time, but may be nevertheless real." Reply to Opposition at 37–38.[15] The Court finds this attempt to portray potential harm as outweighing the individuals' constitutional privacy interests and Fifth Amendment claims to be patently preposterous.

### 4. *Public Interest*

■ The fourth factor, the public interest, likewise mitigates in favor of granting the preliminary injunction. The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest. The government's contention that the public has an interest in assuring the judgment, integrity, and overall trustworthiness of government employees, is undoubtedly correct. However, the public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority.

## V

### *Conclusion*

The plaintiffs appear to have a meritorious case and are deserving of preliminary relief.

the union and that delays in the questionnaire responses are likely to have a detrimental impact on the integrity of the Customs workforce. Motion at 1. The Court has denied leave to file this motion for the reasons stated above, and it notes with disapproval government counsel's lackadaisical approach about something they now claim to consider important. In a case that has been pending for over one year, the excuse of the absence of the affiant from the office for one week and the flooding of the Customs headquarters for one day is frivolous.

If there is to be any check on the government's ability to collect intimate personal information on government employees, it would rest with those individuals who hold positions furthest removed from law enforcement as such. The plaintiffs have presented the Court with this type of challenge. On the other hand, government counsel's arguments, repeated in various guises, reminds one of Senator Joseph McCarthy's reasoning that if one had nothing to hide, one would not invoke the Fifth Amendment's guarantee against compulsory self-incrimination. The Court will not allow such attempts at a revival of a dark period in the nation's history to prevail.

The motion for preliminary injunction is being granted contemporaneously herewith.

## ORDER

Upon consideration of plaintiffs' motion for preliminary injunction, defendants' opposition thereto, plaintiffs' reply, the November 23, 1993 hearing, and the entire record herein, it is this 1st day of December, 1993, in accordance with the Opinion issued herewith

ORDERED that plaintiff's motion for preliminary injunction pending a decision on the merits be and it is hereby granted; and it is further

ORDERED that defendants are hereby preliminarily enjoined from requiring the named plaintiffs and bargaining unit employees of the U.S. Customs Service represented by the National Treasury Employees Union in the same or similar positions as the named plaintiffs to submit answers to Questions 18, 19b, 20, and 21 of the SF–85P, or to submit CF 257 or TD F 67–32.5; and it is further

ORDERED that defendants are hereby preliminarily enjoined from using any of the responses submitted in response to Questions 18, 19b, 20, and 21 of the SF–85P, CF 257, or TD F 67–32.5 in conducting investigations or making employment decisions regarding the plaintiffs and bargaining unit employees in the positions set forth above; and it is further

ORDERED that defendants are hereby preliminarily enjoined from requiring any bargaining unit employees represented by

NTEU with the Customs Service to answer Question 19 of the SF–85P without an affirmative grant of use immunity; and it is further

ORDERED that defendants are hereby preliminarily enjoined from relying on answers already furnished in response to Question 19 or the fruits of those answers, or an employee's refusal to answer Question 19, in making any employment-related decision or in any criminal proceeding involving the responding employee.